524 S.E.2d 915

Sherman JONES and Lori Jones, Plaintiffs Below, Appellants,

v.

PATTERSON CONTRACTING, INC., a West Virginia Corporation; and Grasan Equipment Company, an Ohio Corporation, Defendants Below,

Grasan Equipment Company, Inc., an Ohio Corporation, Defendant Below, Appellee.

Sherman Jones and Lori Jones, Plaintiffs Below, Appellants,

v.

Patterson Contracting, Inc., a West Virginia Corporation; and Grasan Equipment Company, an Ohio Corporation, Defendants Below,

Patterson Contracting, Inc., a West Virginia Corporation, Defendant Below, Appellee.

Nos. 25959, 25960.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 22, 1999.

Decided Nov. 19, 1999.

Concurring and Dissenting Opinion of Justice Davis Nov. 24, 1999.

Timothy P. Rosinsky, Esq., Rosinsky Law Offices, Huntington, West Virginia, Attorney for Appellants.

Mary H. Sanders, Esq., Huddleston, Bolen, Beatty, Porter & Copen, Charleston, West Virginia, Attorney for Patterson Contracting.

Anita R. Casey, Esq., MacCorkle, Lavender & Casey, Charleston, West Virginia and R. Ford Francis, Esq., Shumacher, Francis & Nelson, Charleston, West Virginia, Attorneys for Grason Equipment Company.

PER CURIAM:

This is an appeal by Sherman and Lori Jones (hereinafter "Appellants") from July 28, 1998, and August 27, 1998, orders of the Circuit Court of Logan County granting directed verdicts in favor of Patterson Contracting, Inc., and Grasan Equipment Company (hereinafter "Appellees," "Patterson," or "Grasan").[1] The Appellants maintain that the lower court erred in granting the directed verdicts, that expert testimony was improperly excluded from consideration, and that the Appellants' evidence of deliberate intent was not properly evaluated. We conclude that the lower court erred in granting the directed verdict in favor of Grasan, but we affirm the directed verdict in favor of Patterson.

## I. Facts

On May 15, 1995, Mr. Sherman Jones, employed by Appellee Patterson at Cora, West Virginia, was operating a rock crusher manufactured by Appellee Grasan. Mr. Jones was injured as he placed his head and upper body into a chute in the rock crusher in an attempt to manually dislodge dirt which had become clogged in the machine.[2] While cleaning the chute, dirt and rock dust from within the machine fell on Mr. Jones, trapping him in the chute. He has alleged that he sustained back, neck, and psychiatric injuries as a result of the accident.

The Appellants instituted a civil action in the Circuit Court of Logan County against Patterson based upon the deliberate intent statute, West Virginia Code § 23-4-2(c)(2)(ii)(A–E) (1994), and against Grasan on a products liability theory. Trial commenced on July 13, 1998, and continued through July 16, 1998. The lower court granted directed verdicts in favor of both defendants, entered by order dated July 28, 1998, for Patterson, and August 27, 1998, for Grasan. The Appellants thereafter appealed to this Court.

## II. Review of a Lower Court's Entry of a Directed Verdict

Rule 50(a) of the West Virginia Rules of Civil Procedure authorizes a party to move for a directed verdict. A circuit court should direct a verdict in the defendant's favor if " 'the plaintiff's evidence, considered in the light most favorable to him, fails to establish a prima facie right to recovery[.]' " Syl. Pt. 1, in part, *Brannon v. Riffle*, 197 W.Va. 97, 475 S.E.2d 97 (1996) (quoting Syl. Pt. 3, in part, *Roberts v. Gale*, 149 W.Va. 166, 139 S.E.2d 272 (1964)). In syllabus point three of *Brannon*, this Court explained as follows:

> The appellate standard of review for the granting of a motion for a directed verdict pursuant to Rule 50 of the West Virginia Rules of Civil Procedure is de novo. On appeal, this court, after considering the evidence in the light most favorable to nonmovant party, will sustain the granting of directed verdict when only one reasonable conclusion as to the verdict can be reached. But if reasonable minds could

---

1. The directed verdict in favor of Patterson was entered on July 28, 1998, and Appeal Number 25960 was granted by this Court on that issue. The directed verdict in favor of Grasan was entered on August 27, 1998, and Appeal Number 25960 was granted by this Court on that issue. The two appeals were thereafter consolidated.

2. The rock crushing process originated at Patterson's Quarry where an end loader was used to load rock, dirt, and gravel into trucks. The trucks then transported the material to a stationary rock crusher operated by Mr. Jones. The material was dumped into a "shaker bin" which vibrated to move the material through an opening into the "jaws." As the material moved along a conveyor toward the jaws, smaller rocks and dirt were removed as they passed over a metal grate on top of a collecting chute. The rock chute occasionally became clogged, as in this instance.

differ as to the importance and sufficiency of the evidence, a circuit court's ruling granting a directed verdict will be reversed.

 In evaluating a request for a directed verdict, syllabus point five of *Wager v. Sine,* 157 W.Va. 391, 201 S.E.2d 260 (1973), instructs that "all reasonable doubts and inferences should be resolved in favor of the party against whom the verdict is asked to be directed." " ' "Upon a motion to direct a verdict for the defendant, every reasonable and legitimate inference fairly arising from the testimony, when considered in its entirety, must be indulged in favorably to plaintiff; and the court must assume as true those facts which the jury may properly find under the evidence. Syllabus, *Nichols v. Raleigh–Wyoming Coal Co.,* 112 W.Va. 85[, 163 S.E. 767 (1932) ]." ' Point 1, Syllabus, *Jenkins v. Chatterton,* 143 W.Va. 250[, 100 S.E.2d 808] (1957)." Syl. Pt. 1, *Jividen v. Legg,* 161 W.Va. 769, 245 S.E.2d 835 (1978).

### III. Grasan Products Liability Claim

 The Appellants maintained that Grasan, as manufacturer of the rock crusher, had failed to warn operators of the "dangers associated with the foreseeable use and misuse of its product." They further alleged that the machine was inherently dangerous in its failure to provide a safe and reliable means of cleaning the chute. The Appellants' primary evidence of defective design was introduced at trial through the expert testimony of Mr. Keith Colombo, a licensed professional engineer and a certified safety professional. His practical experience included systems safety analysis in major companies such as Boeing, Martin Marietta, and United Technologies. Mr. Colombo is a member of the American Society of Safety Engineers, the American Society for Testing and Materials, the National Fire Protection Association, and the Systems Safety Society.

Prior to trial, Grasan had presented the lower court with a motion in limine requesting that the lower court prohibit the introduction of Mr. Colombo's testimony based upon his alleged lack of familiarity with the standards of the mining industry in particular. The lower court, however, permitted Mr. Colombo to testify at trial, explaining as follows: "I think this is a question of what weight to give to his testimony and the jury will give whatever weight is appropriate."

Mr. Colombo testified that he was familiar with chutes, conveyors, and material handling. Having viewed numerous photographs and videotapes of the rock crusher, Mr. Colombo opined that there was no safe method by which operators could clean the rock crusher chute. Relying upon standard promulgated by the American National Standard Institute (ANSI) to assist him in identifying hazards in the work place, Mr. Colombo determined that either of two potential design alterations could have prevented access to the chute door: (1) an interlock device to prevent opening the door, or (2) a permanent metal grate to prevent a person from accessing the chute door opening. Mr. Colombo also emphasized that the written materials supplied by Grasan regarding the maintenance and operation of the rock crusher did not instruct the user on the appropriate method of cleaning the chute.

On the morning following Mr. Colombo's presentation of testimony to the jury, Grasan moved to strike Mr. Colombo's testimony in its entirety. The lower court granted Grasan's motion to strike and asked the jury to disregard Mr. Colombo's testimony. The lower court explained that it had done a "disservice" by allowing Mr. Colombo to testify and reasoned as follows:

> There are mining engineers in profusion and you end up with somebody who is an astronautical (sic) engineer from Florida.... [H]e seemed to have a real hard time coping with the stuff and his obvious unfamiliarity with the industry, with the standards of the industry, with anything having to do with the mining industry was just pretty obvious.... There are various engineers who deal with very narrow areas and do not have expertise in other areas and I don't accept the proposition that it is quite that flexible.

The Appellants maintain that Mr. Colombo's lack of experience within the particular field of mining or the realm of rock crushing equipment does not render his testimony as to general safety precautions inadmissible. They contend that any credibility issues are more properly resolved by permitting the jury to have the benefit of all information, establishing an issue of credibility, the weight of the evidence, rather than admissibility.

Grasan asserts that the lower court properly exercised its discretion in striking the testimony of Mr. Colombo based upon his deficiencies in training, education, and experience in the mining industry. Grasan emphasizes that Mr. Colombo had not seen the actual machine in question until the morning of the trial, had not operated a rock crusher, had no knowledge of MSHA (Mine Safety and Health Administration) regulations, and had no knowledge of the mining industry in general.

■ In the determination of the admissibility of expert testimony, we must be guided by the principles of Rule 702 of the West Virginia Rules of Evidence, explaining as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

In syllabus point five of *Gentry v. Mangum*, 195 W.Va. 512, 525, 466 S.E.2d 171, 184 (1995), this Court explained:

> In determining who is an expert, a circuit court should conduct a two-step inquiry. First, a circuit court must determine whether the proposed expert (a) meets the minimal educational or experiential qualifications (b) in a field that is relevant to the subject under investigation (c) which will assist the trier of fact. Second, a circuit

court must determine that the expert's area of expertise covers the particular opinion as to which the expert seeks to testify.

In syllabus point five of *Overton v. Fields*, 145 W.Va. 797, 117 S.E.2d 598 (1960), we explained: "Whether a witness is qualified to state an opinion is a matter which rests within the discretion of the trial court and its ruling on that point will not ordinarily be disturbed unless it clearly appears that its discretion has been abused."

■ "What must be remembered, however, is that there is no 'best expert' rule. Because of the 'liberal thrust' of the rules pertaining to experts, circuit courts should err on the side of admissibility." *Gentry*, 195 W.Va. at 525, 466 S.E.2d at 184, citing II Franklin D. Cleckley, *Handbook on Evidence for West Virginia Lawyers* § 7–2(A) at 24. In *Gentry*,[3] we acknowledged that "we have clearly stated that a broad range of knowledge, skills, and training qualify an expert as such, and rejected any notion of imposing overly rigorous requirements of expertise." 195 W.Va. at 525, 466 S.E.2d at 184. In *Cargill v. Balloon Works, Inc.*, 185 W.Va. 142, 405 S.E.2d 642 (1991), we explained as follows:

> West Virginia Rule of Evidence 702 enunciates the standard by which the qualification of an individual as an expert witness will be determined. It cannot encompass every nuance of a specific factual matter or a particular individual sought to be qualified. It simply requires that the witness must, through knowledge, skill, experience, training, or education, possess scientific, technical, or other specialized knowledge which will assist the trier of fact to understand the evidence or to determine a fact in issue. It cannot be interpreted to require ... that the experience, education, or training of the individual be in complete congruence with the nature of the issue sought to be proven.

*Id.* at 146–47, 405 S.E.2d at 646–47.

■ An additional component of this inquiry is that where issues of credibility are

---

**3.** *Gentry* dealt specifically with expert testimony in the realm of "scientific" evidence derived from the scientific method. Syl. Pt. 6, *Gentry*, 195 W.Va. at 521, 466 S.E.2d at 180.

present, the proper focus may be the weight of the evidence, rather than its admissibility. In *Gentry,* this Court explained the method of dealing with credibility concerns within admissible testimony:

> We are not at all persuaded by the circuit court's concern that the witness was unfamiliar with the specifics of West Virginia law and how that law may relate to the facts of this case. The failure of an expert to be able to explain all aspects of a case or a controlling principle in a satisfactory manner is relevant only to the witness's credibility. "Should ... [a] witness later fail to adequately [explain], define, or describe the relevant standard of care, opposing counsel is free to explore that weakness in the testimony." *Friendship Heights Assoc. v. Vlastimil Koubek,* 785 F.2d 1154, 1163 (4th Cir.1986); see also, *Dobson v. Eastern Associated Coal Corp.,* 188 W.Va. 17, 22, 422 S.E.2d 494, 499 (1992) (suggests that "[t]he fact that a proffered expert may be unfamiliar with pertinent statutory definitions or standards is not grounds for disqualification ... [; s]uch lack of familiarity" affects credibility, not qualification to testify).

195 W.Va. at 528, 466 S.E.2d at 187, n. 23. The consistency of this approach with principles enunciated by the United States Supreme Court was recognized in *Gentry,* as follows: " 'Conventional devices,' like vigorous cross-examination, careful instructions on the burden of proof, and rebuttal evidence, may be more appropriate instead of the 'wholesale exclusion' of expert testimony under Rule 702." 195 W.Va. at 526, 466 S.E.2d at 185, quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 596, 113 S.Ct. 2786, 2798, 125 L.Ed.2d 469, 484.

■ While the determination of whether a witness is qualified to state an opinion typically rests with the circuit court, an abuse of discretion warrants reversal.[4] In note six of *Gentry,* we discussed the abuse of discretion standard:

We review these rulings only for an abuse of discretion. Only rarely and in extraordinary circumstances will we, from the vista of a cold appellate record, reverse a circuit court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect. Our review, however, must have some purpose and that is why we review under the abuse of discretion standard. In general, an abuse of discretion occurs when a material factor deserving significant weight is ignored, when an improper factor is relied upon, or when all proper and no improper factors are assessed but the circuit court makes a serious mistake in weighing them.

195 W.Va. at 520, 466 S.E.2d at 179.

In the case sub judice, Mr. Colombo exhibited extensive knowledge of safety mechanisms and safety issues in general; his lack of distinctive knowledge of the workings of the mining industry should not render his testimony inadmissible. Prohibiting the testimony based upon lack of familiarity with the mining industry as a whole illustrates misapprehension of the fundamental questions raised by the Appellants. This was not predominantly or exclusively a "mining" issue; rather, it was a safety issue to be addressed more appropriately and exhaustively by a "safety" expert such as Mr. Colombo. The jury was asked to resolve the narrow questions of the operation of the chute and the proper methods of cleaning. A safety engineer possessing familiarity with chutes, conveyors, and material handling would appear amply qualified to address that issue and would potentially be more knowledgeable on the precise issues than an expert with more general knowledge of the mining industry. Concerns regarding the parameters of Mr. Colombo's expertise could have been addressed through cross-examination, as issues of credibility rather than admissibility.

We conclude that the lower court abused its discretion in striking the testimony of Mr.

4. We stated in *Gentry* that "where the granting of summary judgment is dependent on the exclusion of expert testimony, as it is sub judice, our review must be more stringent." 195 W.Va. at 519, 466 S.E.2d at 178.

Colombo. In our de novo review of the lower court's ultimate decision on the directed verdict issue, we reverse the decision of the lower court.[5]

## IV. Patterson Deliberate Intent Claim

The Appellants premised their civil action against Patterson upon the deliberate intent statute, West Virginia Code § 23-4-2(c)(2)(ii)(A-E). The pertinent portions of West Virginia Code § 23-4-2(c)(2) provide as follows:

(2) The immunity from suit provided under this section and under section six-a, article two of this chapter, may be lost only if the employer or person against whom liability is asserted acted with "deliberate intention". This requirement may be satisfied only if . . .

(ii) The trier of fact determines, either through specific findings of fact made by the court in a trial without a jury, or through special interrogatories to the jury in a jury trial, that all of the following facts are proven:

(A) That a specific unsafe working condition existed in the workplace which presented a high degree of risk and a strong probability of serious injury or death;

(B) That the employer had a subjective realization and an appreciation of the existence of such specific unsafe working condition and of the high degree of risk and the strong probability of serious injury or death presented by such specific unsafe working condition;

(C) That such specific unsafe working condition was a violation of a state or federal safety statute, rule or regulation,

whether cited or not, or of a commonly accepted and well-known safety standard within the industry or business of such employer, which statute, rule, regulation or standard was specifically applicable to the particular work and working condition involved, as contrasted with a statute, rule, regulation or standard generally requiring safe workplaces, equipment or working conditions;

(D) That notwithstanding the existence of the facts set forth in subparagraphs (A) through (C) hereof, such employer nevertheless thereafter exposed an employee to such specific unsafe working condition intentionally; and

(E) That such employee so exposed suffered serious injury or death as a direct and proximate result of such specific unsafe working condition.

The Appellants claimed that Patterson failed to properly train Mr. Jones regarding safe chute cleaning methods, alleging that Patterson knew its employees inserted their bodies into the chute to clean the materials lodged inside the chute.[6] Thus, the Appellants argued that they proved all five statutory requirements for recovery under the deliberate intent statute.

Patterson contended that it had instructed its employees to stand above the chute while cleaning it and had no knowledge of the methods being utilized by Mr. Jones. Patterson had sent Mr. Jones to a training course offered by the West Virginia Office of Safety, Health & Training providing safety training for operators of machinery with chutes. This training course specified that placing one's body in the chute was dangerous and could result in serious injury.[7]

---

**5.** Although "most rulings of a trial court regarding the admission of evidence are reviewed under an abuse of discretion standard, ... an appellate court reviews de novo the legal analysis underlying a trial court's decision." *State v. Guthrie,* 194 W.Va. 657, 680, 461 S.E.2d 163, 186 (1995). As expressed above, the standard of review for the directed verdict determination is also de novo.

**6.** The Appellants attempted to establish subjective realization by introducing the testimony of Virgil Cook a co-worker of Mr. Jones. Mr. Cook had apparently placed his own body in the chute

when the machine was not running, had told Patterson about this episode, and had been reprimanded. There was no evidence, however, that Patterson had any realization that Mr. Jones was cleaning the chute by placing his body inside the chute.

**7.** The training course included a video designed to teach safe methods of working around chutes. The video specified that dirt hangups in a chute may leave hollow spaces in the middle and "at any moment material can break free and anyone caught inside" could sustain injury. The video further instructed that the proper method of

The lower court found no evidence to support (1) a specific unsafe working condition;[8] (2) a subjective realization by Patterson of a specific unsafe working condition; or (3) an intentional exposure of Mr. Jones to an unsafe condition. As we stated in syllabus point two of *Mayles v. Shoney's, Inc.*, 185 W.Va. 88, 405 S.E.2d 15 (1990): "A plaintiff may establish 'deliberate intention' in a civil action against an employer for a work-related injury by offering evidence to prove the five specific requirements provided in W.Va.Code Sec. 23–4–2(c)(2)(ii) (1983)." *Accord*, Syl. Pt. 4, *Blake v. John Skidmore Truck Stop, Inc.*, 201 W.Va. 126, 493 S.E.2d 887 (1997). West Virginia Code § 23–4–2(c)(2)(iii)(B) provides the following guidance to courts reviewing allegations of deliberate intent: A court shall dismiss an action when, "after considering all the evidence and every inference legitimately and reasonably raised thereby most favorably to the plaintiff, the court shall determine that there is not sufficient evidence to find each and every one of the facts required to be proven" in the deliberate intent statute.

In *Sias v. W–P Coal Co.*, 185 W.Va. 569, 408 S.E.2d 321 (1991), this Court held that "such motions are to be granted when, pursuant to Rule 56(c) of the West Virginia Rules of Civil Procedure, one or more of the five elements of W.Va.Code § 23–4–2(c)(2)(ii)(A)–(E) [1994] do not exist (motion for summary judgment) or when, after considering all of the evidence and every reasonable inference in the light most favorable to the plaintiff, there is insufficient evidence to find each and every one of the aforestated five elements (motion for a directed verdict)." 185 W.Va. at 576, 408 S.E.2d at 328.

Syllabus point three of *Sias* explained:

The portion of the statute which authorizes "prompt judicial resolution" of "delib-

erate intention" actions against employers, specifically, W.Va.Code § 23–4–2(c)(2)(iii)(B) [1994], relates to plaintiffs' more specific substantive law burden under the five-element test of W.Va.Code § 23–4–2(c)(2)(ii)(A)–(E) [1994], but the preexisting procedural law still applies for granting employers' motions for summary judgment, directed verdict and judgment notwithstanding the verdict.

The lower court examined that evidence presented by the Appellants regarding the specific unsafe working condition, Patterson's subjective realization thereof, and the allegation of intentional exposure of Mr. Jones to an unsafe condition. Indulging in every favorable consideration toward the Appellants, the lower court concluded that the directed verdict should be granted in favor of Patterson. In our de novo review of the directed verdict question, we have reviewed the testimony presented on the deliberate intent issue, and we agree with the lower court's conclusions. We therefore affirm in that respect.

### V. Conclusion

Based upon the foregoing, we find that the lower court abused its discretion in granting the directed verdict in favor of Grasan and remand for further proceedings on the Appellants' Grasan claim. We affirm the directed verdict in favor of Patterson.

Affirmed in Part, Reversed in Part, and Remanded.

Judge RISOVICH, sitting by temporary assignment.

Justice SCOTT did not participate.

DAVIS, Justice, concurring in part, dissenting in part:

(Filed Nov. 24, 1999)

This case presented two dispositive issues for resolution by the Court. The first issue

---

cleaning was from the top down and further instructed workers to refrain from inserting any part of the body in the chute.

**8.** The lower court found: "The only evidence of an unsafe condition was the act committed by Sherman Jones when he put his body in a position which he knew was dangerous and which violated his training." The accident was investigated by the West Virginia Office of Mine Health, Safety, and Training. The investigator did not find a violation for failure to train and in fact cited Mr. Jones for his lack of care.

concerned the propriety of the trial court granting judgment to defendant Patterson Contracting, Inc. On this issue, the majority decided that the trial court correctly granted judgment as a matter of law to Patterson Contracting, Inc. I concur in the majority's decision on this issue, as I believe a fair reading of the evidence, in the light most favorable to the plaintiffs, clearly demonstrates that the plaintiffs failed to present justiciable evidence on each of the elements of a statutory deliberate intent cause of action.

The second dispositive issue presented to this Court concerned the trial court's decision to strike expert testimony presented by the plaintiffs through Keith A. Colombo(hereinafter referred to as "Colombo"), an expert in aeronautical engineering. The majority concluded that any question concerning Colombo's credibility was for jury determination. Therefore, it was reversible error to strike Colombo's testimony. I disagree with the majority's resolution of this issue. Were this issue truly one of credibility, the majority would be unassailably correct in finding that the trial court invaded the province of the jury. However, the issue regarding Colombo did not present a question of credibility; but, it presented a question of reliability.

Reduced to its most basic form, the issue concerning Colombo was whether or not a rocket scientist can give expert testimony on a mining industry issue for which he had absolutely no experience, training, skill, education or knowledge. The majority has concluded that an expert without any experience, training, skill, education or knowledge in an area for which he or she testifies, may nevertheless testify as an expert because the jury should be allowed to reject the testimony—should the jury understand the expert is unqualified. In my judgment, the position taken by the majority in this case has completely disregarded the body of law this Court has developed on the admission of expert testimony.

The unshakeable conclusion to be reached from the majority decision in this case is that, for example, a pediatrician having no experience, training, skill, education or knowledge in oral surgery, may nevertheless testify as an expert on oral surgery procedures and standards, because his or her lack of experience, training, skill, education and knowledge in oral surgery presents a credibility issue for the jury to determine. This is an unacceptable standard for the admission of expert testimony. I must, therefore, dissent from the majority's decision that the trial court abused his discretion in striking Colombo's testimony. I do so for two reasons. First, Colombo did not qualify as an expert in the area for which he was rendering an opinion. Second, assuming arguendo, that a rocket scientist is permitted to testify on a mining industry safety issue, Colombo's testimony was unreliable.

I.

### COLOMBO'S TESTIMONY WAS INADMISSIBLE BECAUSE HE WAS NOT QUALIFIED TO TESTIFY AS AN EXPERT ON MINING EQUIPMENT SAFETY

The majority opinion in this case has taken many of this Court's well developed legal principles, regarding the admission of expert testimony, and twisted them so as to convey the impression that this Court has historically allowed a witness to testify as an expert in an area where he or she has no experience, training, skill, education or knowledge. Until the decision in this case, our state law has never held that a witness may testify as an expert in an area in which he or she has no experience, training, skill, education or knowledge.

Rule 702 of the West Virginia Rules of Evidence enumerates the broad criteria by which a person may qualify as an expert. Rule 702 states that a person may qualify as an expert based upon "knowledge, skill, experience, training, or education[.]" [1] Justice

---

1. Rule 702 provides: "If scientific, technical, or other specialized knowledge will assist the trier

of fact to understand the evidence or to determine a fact in issue, a witness qualified as an

Cleckley established a workable test for determining whether a person is an expert in the seminal case of *Gentry v. Mangum*, 195 W.Va. 512, 466 S.E.2d 171 (1995). Syllabus point 5 of *Gentry* states:

> In determining who is an expert, a circuit court should conduct a two-step inquiry. First, a circuit court must determine whether the proposed expert (a) meets the minimal educational or experiential qualifications (b) in a field that is relevant to the subject under investigation (c) which will assist the trier of fact. Second, a circuit court must determine that the expert's area of expertise covers the particular opinion as to which the expert seeks to testify.

Although the majority opinion quoted syllabus point 5 of *Gentry*, it failed to completely perform any analysis under this fundamental test to determine whether Colombo was qualified as an expert on the issue for which he was asked to render an opinion. In other words, the majority opinion assumed, contrary to the overwhelming evidence, that Colombo qualified as an expert on the issue for which he was asked to render an opinion. With this assumption, the majority then analyzes the issue in terms of a "qualified" expert. This forced and unreasonable assumption lead the majority to reason that this case turns on the issue of credibility and not admissibility. Both the assumption and conclusion are wrong.

Under the first part of the *Gentry* test it must be shown that a proffered expert meets the minimal educational or experiential qualifications in a field that is relevant to the subject under investigation. Colombo did not satisfy the initial test.[2] The record in this case is unquestionably clear that Colombo was an expert by education, training and

experience in the general area of aeronautical safety engineering. If this case involved aeronautical safety issues, Colombo would probably qualify as an expert. However, this case involved engineering safety devices for a mining industry rock crushing machine. The record is void of any evidence that Colombo had experience, training, skill, education or knowledge regarding engineering safety devices for such a piece of mining equipment.

The majority opines that because Colombo had expertise as a safety engineer in aeronautical devices, he is therefore qualified to testify as an expert on engineering safety devices for mining equipment. The majority's reasoning allows anyone with expertise in a specific area to testify, without experience, training, skill, education or knowledge, as an expert outside of his or her specific area.[3] In other words, the majority, by this decision, has announced that in West Virginia an engineer in bridge safety may testify as an expert about any engineering safety issue, even though he or she has no experience, training, skill, education or knowledge about engineering safety issues outside of bridge safety. I simply cannot accept this result.

## II.

### COLOMBO'S TESTIMONY WAS INADMISSIBLE BECAUSE IT WAS NOT RELIABLE

While it is my firm position that Colombo did not qualify as an expert to render an opinion on mine safety, even were I categorically wrong, Colombo's testimony was still properly excluded because it was unreliable. One need look no further than the recent decision by the United States Supreme Court in *Kumho Tire Company, Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), which follows the *Gentry* analysis.

---

expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise."

**2.** There is no need to discuss the second part of the *Gentry* test because Colombo does not satisfy the first part of the conjunctive test.

**3.** The majority opinion reaches the conclusion that "[t]his was not predominately or exclusively a 'mining' issue." Such a statement is wrong. This case was absolutely and exclusively about safety devices for a mining industry rock crushing machine.

That is, any expert testimony must be scrutinized for relevancy and reliability.

The plaintiffs in *Kumho* were involved in an automobile accident that occurred after a tire on their minivan blew out. The plaintiffs filed an action in a federal district court against the tire manufacturer, alleging manufacturing or design defect in the tire. The plaintiffs sought to use the testimony of an engineering expert in tire failure analysis to render an opinion that the tire blew out because of manufacture or design defect. The defendant filed a motion in limine to preclude testimony by the plaintiffs' expert. The federal district court granted the motion after concluding that the expert's testimony was inadmissible because the methodology used by the expert was unreliable.

On appeal to the Eleventh Circuit the district court's ruling was reversed. The Court of Appeals found that the district court improperly applied the test for expert scientific testimony established in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).[4] Under the reasoning of the Court of Appeals, the *Daubert* test was only applicable to scientific expert testimony.[5] The Supreme Court rejected the Court of Appeals' limitation of *Daubert* to scientific experts.[6] The Supreme Court reasoned as follows:

> [I]t would prove difficult, if not impossible, for judges to administer evidentiary rules under which a gatekeeping obligation depended upon a distinction between "scientific" knowledge and "technical" or "other specialized" knowledge. There is no clear line that divides the one from the others. Disciplines such as engineering rest upon scientific knowledge.

*Kumho*, 526 U.S. at 148, 119 S.Ct. at 1174.

The Supreme Court further concluded:

> [T]he trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable. That is to say, a trial court should consider the specific factors identified in Daubert where they are reasonable measures of the reliability of expert testimony.

*Kumho*, 526 U.S. at 152, 119 S.Ct. at 1176.

The next issue addressed by the Supreme Court in *Kumho* was whether the district court abused its discretion in excluding the testimony of plaintiffs' tire engineering expert. The opinion observed:

> The District Court did not doubt [the expert's] qualifications, which included a masters degree in mechanical engineering, 10 years' work at Michelin America, Inc., and testimony as a tire failure consultant in other tort cases. Rather, it excluded the testimony because, despite those qualifications, it initially doubted, and then found unreliable, "the methodology employed by the expert in analyzing the data

---

4. This Court adopted the *Daubert* test for admission of expert scientific testimony in *Wilt v. Buracker*, 191 W.Va. 39, 46, 443 S.E.2d 196, 203 (1993) ("We conclude that *Daubert's* analysis of Federal Rule 702 should be followed in analyzing the admissibility of expert testimony under Rule 702 of the West Virginia Rules of Evidence. The trial court's initial inquiry must consider whether the testimony is based on an assertion or inference derived from scientific methodology. Moreover, the testimony must be relevant to a fact at issue. Further assessment should then be made in regard to the expert testimony's reliability by considering its underlying scientific methodology and reasoning. This includes an assessment of (a) whether the scientific theory and its conclusion can be and have been tested; (b) whether the scientific theory has been subjected to peer review and publication; (c) whether the scientific theory's actual or potential rate of error is known; and (d) whether the scientific theory is generally accepted within the scientific community.").

5. In *Gentry* this Court extended the *Daubert/Wilt* analysis to all experts.

6. In *West Virginia Division of Highways v. Butler*, 205 W.Va. 146, 516 S.E.2d 769 (1999) this Court specifically declined to adopt the holding in *Kumho*. Upon closer reflection, it is obvious that *Kumho's* holding is consistent with *Gentry*. That is, both *Gentry* and *Kumho* took the *Wilt/Daubert* analysis and simply made it applicable to all proffered expert testimony.

obtained in the visual inspection, and the scientific basis, if any, for such an analysis."

*Kumho*, 526 U.S. at 153, 119 S.Ct. at 1176–1177.

After a careful review of facts in the case, the Supreme Court concluded that the district court was correct in excluding testimony of plaintiffs' expert. "Rule 702 grants the district judge the discretionary authority, reviewable for its abuse, to determine reliability in light of the particular facts and circumstances of the particular case." *Kumho*, 526 U.S. at 158, 119 S.Ct. at 1179.

In syllabus point 3 of *Gentry*, Justice Cleckley plainly, clearly and unequivocally held that "[t]he first and universal requirement for the admissibility of [expert] evidence is that the evidence must be both 'reliable' and 'relevant.'" The Fourth Circuit Court of Appeals addressed the issue of the reliability of an expert's testimony in *Redman v. John D. Brush & Co.*, 111 F.3d 1174 (4th Cir.1997). In *Redman* the owner of a burglarized safe filed a products liability action against the safe manufacturer, alleging that the safe was negligently designed. The trial court allowed the plaintiff to present expert testimony showing a manufacturing defect in the design of the safe. The jury returned a verdict for the plaintiff. On appeal the Fourth Circuit reversed.

The Fourth Circuit reversed the judgment in *Redman*, in part, because it found the district court committed error in admitting testimony by the plaintiff's metallurgic expert. *Redman* held:

> The problem with the admissibility of [the testimony] is that Redman's expert was not qualified to testify about industry standards. He had never before analyzed a safe, engaged in the manufacture or design of safes, or received any training regarding safes. Even more importantly, he was not personally familiar with the standards and rating systems for fire pro-

tection capacity and burglary protection capacity used in the safe industry. He acknowledged that his only knowledge of safes was acquired in preparation for this trial through discussions he had initiated with people who sold, distributed, or repaired safes.

> ... In this case, an expert in the relevant field would be familiar with the design and manufacture of safes and the industry standards regarding safes. There is no proof and no reason to believe that such an expert would rely on conversations with store personnel to identify a standard of burglar protection capacity.

> ... In the absence of an industry standard for burglar deterrence, it would be speculative and misleading for the expert to opine that the safe did not meet that undefined standard.... Under these circumstances, it was error to permit Redman's expert to testify that the safe was not "burglar deterrent."

*Redman*, 111 F.3d at 1179–1180.

The decision in *Redman* is important for several reasons. First, *Redman* recognized that merely because a person is an expert in metallurgy, does not immediately qualify that person to render an opinion on whether a metal safe was negligently designed. Second, *Redman* acknowledged that a person with general metallurgical knowledge could render such an opinion on whether a metal safe was negligently designed, if such person obtained adequate knowledge to formulate an opinion. Third, and most importantly, *Redman* held that for a person with only general metallurgical knowledge to testify as an expert on negligent design of a safe, the source of the person's knowledge must be reliable.

In the instant proceeding, Colombo's expertise was in aeronautical engineering safety. Colombo was asked to render an expert opinion on engineering safety requirements for a piece of mining equipment. For Colombo to qualify as an expert on engineering safety requirements for a mining industry rock crushing machine, he had to demonstrate knowledge in the area that would be consistent with an actual expert in the field

of mining equipment safety. After the trial court listened to Colombo's testimony, the trial court concluded that Colombo did not have the knowledge of mining equipment safety that an expert would have in the field of mine safety. *See Black v. Food Lion, Inc.*, 171 F.3d 308, 311 (5th Cir.1999) ("The overarching goal of [the trial court's] gatekeeping requirement ... is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.").

Notwithstanding these facts, the majority opinion states that: "Mr. Colombo exhibited extensive knowledge of safety mechanisms and safety issues in general; his lack of distinctive knowledge of the workings of the mining industry should not render his testimony inadmissible." The majority conceded that Colombo knew nothing about the issue upon which he was called to render an opinion. Yet, the majority concluded that because he was competent in other safety matters his testimony was admissible. Based upon Rule 702 and this Court's *Gentry* analysis, the logical and correct conclusion to reach was that Colombo's testimony was unreliable and therefore inadmissible.

The majority further supports its decision by relying upon the fact that Colombo was familiar with mining industry ANSI standards. What the majority failed to mention was that the ANSI standards relied upon by Colombo were not the applicable versions for the equipment at issue. In other words, Colombo used the wrong ANSI standards to reach his opinion. Unfortunately, the majority disregarded this critical fact and determined the matter a question of credibility for the jury.

Colombo's use of outdated ANSI standards goes to the issue of reliability and ultimately admissibility. Consistent with the United States Supreme Court's ruling in *Daubert*, we have made it a cornerstone requirement that an "assessment should ... be made in regard to the expert testimony's reliability by considering its underlying scientific methodology and reasoning." *Wilt v. Buracker*, 191 W.Va. 39, 46, 443 S.E.2d 196, 203 (1993).[7] In syllabus point 4 of *Mayhorn v. Logan Medical Foundation*, 193 W.Va. 42, 454 S.E.2d 87 (1994) we unequivocally held that "an expert's opinion is admissible if the basic methodology employed by the expert in arriving at his opinion is scientifically or technically valid and properly applied." Justice Cleckley cautioned this Court that "[e]vidence which is no more than speculation is not admissible under Rule 702." *State v. LaRock*, 196 W.Va. 294, 307, 470 S.E.2d 613, 626 (1996). "[T]he majority confuses the [credibility] of an expert witness—a matter for the jury—with the reliability of his or her methodology—a matter initially for the trial judge." *In re Unisys Savings Plan Litigation*, 173 F.3d 145, 161 (3d Cir.1999) (Becker, J. dissenting). *See Newman v. Hy-Way Heat Systems, Inc.*, 789 F.2d 269, 270 (4th Cir.1986) ("[N]othing in the Rules appears to have been intended to permit experts to speculate in fashions unsupported by ... evidence."). In my judgment, the majority opinion has dismantled the reliability criterion set out in *Wilt v. Buracker*, 191 W.Va. 39, 46, 443 S.E.2d 196, 203 (1993) and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and replaced it with credibility. *See United States v. Charley*, 189 F.3d 1251, 1266 (10th Cir.1999) ("Rule [702] imposes a special gatekeeping obligation on the trial judge to ensure that an opinion offered by an expert is reliable"); *United States v. Harris*, 192 F.3d 580, 588 (6th Cir.1999) ("[T]his Circuit

---

7. *Daubert* made clear that, when determining whether the expert's opinion has a reliable foundation, the trial judge's "focus ... must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595, 113 S.Ct. at 2797. *National Bank of Commerce of El Dorado v. Associated Milk Producers, Inc.*, 191 F.3d 858, 862 (8th Cir.1999) ("The focus of the district court's analysis of the proffered evidence is appropriately limited solely to principles and methodology, not on the conclusions that they generate.").

has broadly applied *Daubert's* ... reliability analysis to all evidence offered under Rule 702."); *Allison v. McGhan Medical Corp.,* 184 F.3d 1300, 1310 (11th Cir.1999) ("While meticulous *Daubert* inquiries may bring judges under criticism for donning white coats and making determinations that are outside their field of expertise, the Supreme Court has obviously deemed this less objectionable than dumping a barrage of questionable scientific evidence on a jury, who would likely be even less equipped than the judge to make reliability and relevance determinations and more likely than the judge to be awestruck by the expert's mystique.").

In addressing the issue of expert testimony in *Gentry,* 195 W.Va. at 524, 466 S.E.2d at 183, this Court noted that "Rule 702 has three major requirements: (1) the witness must be an expert; (2) the expert must testify to scientific, technical or specialized

knowledge; and (3) the expert testimony must assist the trier of fact." I find it difficult to believe that Colombo's inaccurate and unreliable testimony could "assist the trier of fact." [8]

In summary, the concept of reliability is an issue for trial court determination. The concept of credibility is a jury question. In this case, the majority has confused the two issues. As such, and for the reasons set forth, I concur in part and respectfully dissent in part from the majority's decision in this case. I am authorized to state that Justice Maynard joins me in this dissent.

---

**8.** *See Short v. Appalachian OH–9, Inc.,* 203 W.Va. 246, 253, 507 S.E.2d 124, 131 (1998) ("[T]he essence of Rule 702 is that of assisting the fact finder's comprehension through expert testimony."); *Tanner v. Rite Aid of West Virginia, Inc.,* 194 W.Va. 643, 654 n. 17, 461 S.E.2d 149, 160 n. 17 (1995) ("Helpfulness to the jury ... is the touchstone of Rule 702."). The circuit court properly found that the trier of fact could not be assisted by testimony from a proffered expert witness who knew absolutely nothing about the issue to which he was testifying. "[T]he trial court heard the evidence and granted a motion to strike the testimony.... On this record, there is no principled way for us to second guess that ruling; nor [should] we strain to do so." *LaRock,* 196 W.Va. at 307, 470 S.E.2d at 626. *See Allison v. McGhan Medical Corp.,* 184 F.3d 1300, 1311–1312 (11th Cir.1999) ("The judge's role is to keep unreliable and irrelevant information from the jury because of its inability to assist in factual determinations, its potential to create confusion, and its lack of probative value."); *Westberry v. Gislaved Gummi AB,* 178 F.3d 257, 262 (4th Cir.1999) ("[T]he obligation [is on] a district court to determine whether expert testimony is reliable and relevant prior to admission"); *Cortes–Irizarry v. Corporacion Insular De Seguros,* 111 F.3d 184, 188 (1st Cir.1997) ("A trial setting normally will provide the best operating environment for the triage which *Daubert* demands.... [G]iven the complex factual inquiry required by *Daubert,* courts will be hard-pressed in all but the most clearcut cases to gauge the reliability of expert proof on a truncated record.").