**FILED**
**June 11, 2021**
**released at 3:00 p.m.**
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

# IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

## January 2021 Term

_____

## No. 20-0041

_____

### THOMAS B. MILLER AND JAMIE L. MILLER,
**Plaintiffs Below, Petitioners**

## V.

### WESBANCO BANK, INC.,
**Defendant Below, Respondent**

_____

**Appeal from the Circuit Court of Marion County
The Honorable David R. Janes, Judge
Civil Action No. CC-24-2017-C-119**

**AFFIRMED**

_____


## AND


_____

## No. 20-0042

_____


### WESBANCO BANK, INC.,
**Defendant Below, Petitioner**

## V.

### THOMAS B. MILLER AND JAMIE L. MILLER,
**Plaintiffs Below, Respondents**

_____

**Appeal from the Circuit Court of Marion County**
**The Honorable David R. Janes, Judge**
**Civil Action No. CC-24-2017-C-119**

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED**
_____

**Submitted: February 17, 2021**
**Filed: June 10, 2021**

**Jacques R. Williams**     **Joseph V. Schaeffer**
**Hamstead, Williams & Shook PLLC**  **Spilman Thomas & Battle, PLLC**
**George B. Armistead**     **Pittsburgh, Pennsylvania**
**Baker & Armistead**      **James A. Walls**
**Morgantown, West Virginia**   **Spilman Thomas & Battle, PLLC**
**Attorneys for the Millers**    **Morgantown, West Virginia**
            **Attorneys for WesBanco Bank, Inc.**

**CHIEF JUSTICE JENKINS delivered the Opinion of the Court.**

**JUSTICE WOOTON dissents in No. 20-0041, concurs in part and dissents in part in No. 20-0042, and reserves the right to file a separate opinion.**

**SYLLABUS BY THE COURT**

1.	West Virginia Code section 56-6-27 (eff. 1923) provides the exclusive means by which to obtain prejudgment interest in any action founded on contract. Failure to submit the question of prejudgment interest to the jury results in waiver of the same.

2.	"'""Separate written instruments will be construed together and considered to constitute one transaction where the parties and the subject matter are the same, and where there is clearly a relationship between the documents." Syllabus point 3, *McCartney v. Coberly*, ___ W. Va. ___, 250 S.E.2d 777 (1978), *overruled on other grounds by* Syllabus point 2, *Overfield v. Collins*, 199 W. Va. 27, 483 S.E.2d 27 (1996).' Syl. Pt. 1, *McDaniel v. Kleiss*, 202 W. Va. 272, 273-74, 503 S.E.2d 840, 841-42 (1998)." Syllabus point 3, *TD Auto Finance LLC v. Reynolds*, 243 W. Va. 230, 842 S.E.2d 783 (2020).

3.	"'"A valid written instrument which expresses the intent of the parties in plain and unambiguous language is not subject to judicial construction or interpretation but will be applied and enforced according to such intent.' Syl. pt. 1, *Cotiga Development Company v. United Fuel Gas Company*, 147 W. Va. 484, 128 S.E.2d 626 ([1962])." Syllabus point 1, *Sally-Mike Properties v. Yokum*, 175 W. Va. 296, 332 S.E.2d 597 (1985).

4.    "The determination of whether a deed, contract, or other writing is ambiguous and does not clearly express the intention of the parties is a question of law to be determined by the court."  Syllabus point 3, *Harrell v. Cain*, 242 W. Va. 194, 832 S.E.2d 120 (2019).

5.    "If a circuit court finds that a deed, contract, or other writing is ambiguous and does not clearly express the intention of the parties, then the proper interpretation of that ambiguous document, when the facts are in dispute, presents a question of fact for the factfinder to resolve after considering all relevant extrinsic evidence."  Syllabus point 4, *Harrell v. Cain*, 242 W. Va. 194, 832 S.E.2d 120 (2019).

6.    "'[W]here the meaning [of a writing] is uncertain and ambiguous, parol evidence is admissible to show the situation of the parties, the surrounding circumstances when the writing was made, and the practical construction given to the contract by the parties themselves either contemporaneously or subsequently. . . .'  Syl. Point 4, *Watson v. Buckhannon River Coal Co*., 95 W. Va. 164, 120 S.E. 390 (1923)."  Syllabus point 1, in part, *Buckhannon Sales Co., Inc. v. Appalantic Corp*., 175 W. Va. 742, 338 S.E.2d 222 (1985).

7.    "'In considering whether a motion for judgment notwithstanding the verdict under Rule 50(b) of the West Virginia Rules of Civil Procedure should be granted,

the evidence should be considered in the light most favorable to the plaintiff, but, if it fails to establish a *prima facie* right to recover, the court should grant the motion.'  Syllabus point 6, *Huffman v. Appalachian Power Company*, 187 W. Va. 1, 415 S.E.2d 145 (1991)."  Syllabus, *First National Bank of Bluefield v. Clark*, 191 W. Va. 623, 447 S.E.2d 558 (1994) (per curiam).

8.  ""'"Upon a motion to direct a verdict for the defendant, every reasonable and legitimate inference fairly arising from the testimony, when considered in its entirety, must be indulged in favorably to plaintiff; and the court must assume as true those facts which the jury may properly find under the evidence.  Syllabus, *Nichols v. Raleigh-Wyoming Coal Co.*, 112 W. Va. 85[, 163 S.E. 767 (1932)].'"  Point 1, Syllabus, *Jenkins v. Chatterton*, 143 W. Va. 250[, 100 S.E.2d 808] (1957).'  Syl. Pt. 1, *Jividen v. Legg*, 161 W. Va. 769, 245 S.E.2d 835 (1978)."  Syllabus point 4, *Jones v. Patterson Contracting, Inc.*, 206 W. Va. 399, 524 S.E.2d 915 (1999).

9.  "In an action to recover damages for breach of contract, when the case has been fairly tried and no error of law appears, the verdict of a jury, based upon conflicting testimony and approved by the trial court, will not be disturbed unless the verdict is against the plain preponderance of the evidence."  Syllabus point 3, *Franklin v. Pence*, 128 W. Va. 353, 36 S.E.2d 505 (1945).

10.     "To entitle plaintiff to recover substantial damages for breach of contract, where the loss is pecuniary and susceptible of proof with approximate accuracy, he[/she] must establish the quantum of damages with reasonable certainty.  Where no sufficient data is afforded whereby a jury may definitely ascertain the compensation due for the breach, recovery therefor can be nominal only."  Syllabus point 2, *Wilson v. Wiggin*, 77 W. Va. 1, 87 S.E. 92 (1915).

**Jenkins, Chief Justice:**

These consolidated appeals arise from breach-of-contract litigation between borrowers Thomas and Jamie Miller ("the Millers") and lender WesBanco Bank, Inc. ("WesBanco"). Having reviewed the parties' briefs, their oral arguments, the appendix record, and the pertinent authorities, we resolve the issues herein raised as follows. The Millers, who prevailed below, challenge the circuit court's denial of prejudgment interest, which was based upon their failure to request the same from the jury pursuant to West Virginia Code section 56-6-27 (eff. 1923). We find no error and affirm the circuit court's ruling as to prejudgment interest.

In its separate appeal, which was consolidated with the Millers' appeal for purposes of our review, WesBanco raises four assignments of error. First, WesBanco assigns error to the circuit court's admission of parol evidence related to the agreement between the Millers and WesBanco rather than limiting the evidence to only the Construction Loan Agreement itself. We apply the single transaction rule and find that the agreement between the Millers and WesBanco was not limited to only the Construction Loan Agreement. Furthermore, because the agreement was ambiguous, we find no error in the circuit court's admission of parol evidence. WesBanco next claims that the circuit court erroneously allowed the Millers to rely on the duty of good faith and fair dealing to modify WesBanco's contractual obligations. To the contrary, we find the duty of good

1

faith and fair dealing was properly applied. In its third assignment of error, WesBanco argues that the circuit court erred in denying its motion for judgment as a matter of law because the Millers failed to establish a prima facia case as to their breach-of-contract claims and resultant damages. Having reviewed the evidence, we find the Millers presented sufficient evidence such that the circuit court did not err in denying judgment as a matter of law to WesBanco. Finally, WesBanco argues that the jury's damages award of $404,500 was against the clear weight of the evidence. We agree that the Millers' evidence fails to support this verdict. Therefore, we reverse the award and remand this case for a new trial on damages only. Accordingly, the Millers' appeal is affirmed. WesBanco's appeal is affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

## I.

## FACTUAL AND PROCEDURAL HISTORY

In August 2015, the Millers contracted with Residential Creations LLC ("Residential Creations") to build a family home for them in Fairmont, West Virginia.[1] The agreed-upon price for the home was $690,000, and the construction contract provided the following schedule for payments to be made at the completion of certain project benchmarks:

| | |
|---|---|
| Initial payment | $ 70,000.00 |
| Foundation | 130,000.00 |

---

[1] The construction contract was executed on August 31, 2015.

| | |
|---|---|
| Pre-fab, Walls & Floor (In Shop) | 60,000.00 |
| Superstructure A | 135,000.00 |
| Superstructure B | 50,000.00 |
| Rough Mechanicals | 75,000.00 |
| Insulation/Drywall | 65,000.00 |
| Interior/Exterior A | 50,000.00 |
| Interior/Exterior B | 45,000.00 |
| Retainage: | 10,000.00 |
| Total | $690,000.00 |

To finance the construction of their home, the Millers contacted WesBanco and worked with a loan originator named Michelle Hamilton. As part of a pre-qualification process that occurred in advance of their execution of the construction contract, the Millers were provided a document titled "WesBanco Bank, Inc.[,] Mortgage Loan Department[,] Expectations: Borrower/Builder" ("Expectations form"). The document was signed by the Millers on June 26, 2015; it also bears a signature above the line designated "Builder,"[2] which is dated September 9, 2015.[3] According to this Expectations form, lien waivers would be required from each subcontractor and the general contractor, and no funds would be disbursed for work not completed or materials not installed:

---

[2] While the signature is largely illegible, we presume it is the signature of Derrick Pritt on behalf of Residential Creations LLC.

[3] During the trial of this case, Michelle Hamilton was asked if the loan would proceed without a signed Expectations form. She responded, "[n]ot that I'm aware. It was required to be signed before the construction loan." She additionally testified that she was not aware of any loan going forward at closing without an Expectations form first being signed by the borrowers.

The following requirements must be addressed with the borrower(s) and their builder as soon as possible. Failure to make the borrower(s) and their builder aware of this information may result in a delayed closing or first draw.

. . . .

All draw requests will be supported by the following documentation:

–Builder's Affidavit: Properly completed with all work detailed including materials and labor for all subcontractors. The total amount due must be clearly identified. The form must be signed by the general contractor in the presence of a notary public.

–Lien Waivers: Required. Properly executed and notarized Lien Waivers must be presented by each sub contractor in addition to the general contractor.

–Authorization to Draw Funds: Must be signed by the borrower(s) and must correspond with the Builder's Affidavit and Lien Waivers.

–Inspections: An inspection may be required depending on the total amount disbursed compared to the total amount complete. No funds will be advanced until the inspection (if required) has been received.

Funds will not be disbursed for work not completed. The first draw will not be made until the foundation is complete (exception would be funds disbursed at closing for lot purchase if applicable).

Funds will not be disbursed for materials on site not installed.

During the trial in this matter, Ms. Hamilton testified that she also told the Millers that WesBanco would obtain lien waivers before each draw payment and payment would be made only for completed work.

4

Thereafter, the Millers executed a residential Construction Loan Agreement and a separate Construction Loan Addendum[4] with WesBanco, under which WesBanco agreed to loan them $555,000 to be used in building their new home.[5] Section 4 of the Construction Loan Agreement, titled "Advance of Funds," set out the procedure for requesting WesBanco to disburse loan funds (sometimes referred to as draws):

> 4. Advance of Funds. Funds required for the project shall include Borrower's funds in addition to the loan proceeds set forth herein.
>
> . . . .
>
> B.) The procedure for requesting disbusements [*sic*] is as follows:
>
> (i) When funds are needed for the project, Borrower shall notify Lender at least 48 hours prior to the date that an advance is required. Lender agrees to advance funds in accordance with the CONSTRUCTION LOAN DISBURSEMENT SCHEDULE attached hereto as Exhibit "A" and made a part thereof.[6] Lender shall be under no obligation to advance funds hereunder until Lender has obtained a satisfactory inspection report from an inspector of its own choosing indicating that sufficient construction has occurred to support the amount of draw requested and has

---

[4] The terms contained in the Construction Loan Addendum are not relevant to the instant dispute.

[5] Although the construction contract between the Millers and Residential Creations was dated August 28, 2015, and provided that the total price for the work agreed upon was $690,000, the Construction Loan Agreement refers to a construction contract dated June 21, 2015, for the amount of $719,100.

[6] The record does not appear to contain a document titled "Construction Loan Disbursement Schedule." Instead, WesBanco advanced funds in accordance with the schedule of payments set out in the construction contract between the Millers and Residential Creations, which is quoted above.

received the executed Waiver of Liens from the general contractor and from the subcontractors, suppliers and materialmen, *if deemed necessary*. Borrower hereby grants to Lender, or its authorized representative, authority to enter onto the subject Property at reasonable times to perform the inspections provided for herein. Borrower further agrees that any such inspections shall in no way be construed to warrant the quality of workmanship of any work performed.

(ii) Draw Inspections are made as requested by Borrower according to the Disbursement Schedule.

C.) After depletion of the Borrower's portion of the contract price specified above towards the construction of the proposed improvements, Lender shall, upon application of the Borrower make periodic disbursements to the Borrower for payment *for work actually performed, materials delivered, or materials for the delivery of which the [B]orrower has entered into an agreement*, provided:

(i) That the *initial request* for disbursement of the proceeds of the loan *shall be accompanied by the executed waiver of lien forms signed by all contractors, subcontractors, and materialmen who furnished labor or materials to the site prior to the initial advance*;

(ii) That *all subsequent disbursements* shall have been approved by the Construction Loan Department, to the effect that the improvements are being completed in accordance with the predetermined schedule for utilization of the contract price and *shall be accompanied by the executed waiver of lien forms signed by all contractors, subcontractors, and materialmen who furnished labor or materials to the site prior to the initial advance*[.]

(Emphasis added). In addition, the Construction Loan Agreement included the following two provisions that are germane to this appeal:

6. Final Advance of the Loan. The obligation of the Lender to make the final advance under the loan shall be subject to the Borrower providing evidence satisfactory to the

6

Lender that a permanent certificate of occupancy and all governmental approvals, federal, state and local, necessary for the use and occupancy of the improvements have been obtained, if required. In addition, the Borrower shall provide a survey satisfactory to the Lender of the completed improvements meeting the requirements stated in this Agreement. Borrower shall provide Lender with a final inspection report which must be satisfactory to the Lender, and *the Lender has received the fully executed Waiver of liens from all subcontractors, suppliers and materialmen* and the Builder's Affidavit.

7. Mechanic's Lien. Borrower agrees that any mechanic's lien filed upon the property shall be Borrower's sole responsibility and hereby holds Lender harmless against all losses, including but not limited to, liability, costs, or damages resulting from same.

(Emphasis added). Closing for the Construction Loan Agreement was on October 22, 2015. At closing, the Millers tendered a cash payment of approximately $149,000 to cover a portion of the construction costs along with other expenses such as those charged by a construction inspector, some of the site preparation costs, and fees associated with the closing of the loan. The portion of the Millers' deposit related to the construction was to be disbursed by WesBanco along with the loan proceeds.

The initial $70,000 payment to Residential Creations was made at closing. Thereafter, four documents were required by WesBanco in connection with each draw request. First, WesBanco required a "Waiver of Lien Materials or Labor" form signed by the builder, Residential Creations, and notarized. This form included the builder's certification that there were no outstanding charges: "The undersigned further certifies that

7

there are no outstanding charges that may result in liens against said property." Second, a notarized "Builder's Affidavit" had to be submitted by Residential Creations with each draw request. This form specified that

> [t]he undersigned, being first duly sworn on oath, deposes and says that he is Residential Creations LLC, the Builder for the work on the [Millers' home], that the following are the names of all parties who have furnished material or labor, or both, to the undersigned for said work and of all parties having contracts or subcontracts with the undersigned for specific portions of said work or for materials entering into the construction thereof and the amount due or to become due to each, and that the items mentioned include all labor and material required to complete said work according to plans and specifications[.]

Space was then provided for the builder to list the names of sub-contractors, the kind of work performed, the amount of the contract, the amount paid to date, and the balance due or to become due. However, instead of providing this information, the forms submitted to WesBanco by Residential Creations used this area to identify the benchmark that had been achieved as identified in the draw schedule set out in the construction contract. For example, the builder's affidavit for the second benchmark on the draw schedule simply stated in this space:

FOUNDATION DRAW<br>
AS PER DRAW SCHEDULE<br>
SET FORTH IN CONSTRUCTION CONTRACT

Third, prior to each disbursement of construction loan funds, the Millers were required to sign a "Draw Funds Disbursement Authorization" form, which included the following acknowledgement: "The Borrower further states that Borrower has inspected, is satisfied

8

and accepts such completed work and will, in no way, hold Lender responsible for any consequences which may arise as a result of this release." Finally, WesBanco obtained a construction progress inspection report establishing the percentage of construction progress that had been accomplished.

The first two draw requests initiated by Residential Creations, which were made together and totaled $190,000.00, occurred in November 2015 and prompted an email exchange between Mrs. Miller and WesBanco. Mrs. Miller first sent an email on November 10, 2015, which was addressed to Michelle Hamilton and to WesBanco's Residential Construction Lending department, that stated:

> Ladies, we have a problem, Derrick Pritt [Residential Creations] sent to us this morning two draw requests, one for the foundation $130,000.00 and one for the pre-fab $60,000.00 for our construction loan. No where [sic] near has all of this work been completed and Michelle, you told us several times that with the exception of his initial $70,000.00 draw made at closing, no funds would be dispersed until work was completed. Derrick Pritt says that his draw schedule- which Brad and I have never seen to our recollection- states that the disbursement will be made for work that is completed AND IN PROGRESS.
>
> The draw request forms you all sent to us say nothing about work in progress, only for work completed. The loan documents we signed and have copies of state for work completed. So, where does the notion come that we are ready to release $190,000.00 plus the $70,000.00 draw at closing for what little has been done so far? Derrick stated that he verified with Michelle today that their draw schedule was going to be followed, the same agreement he says states for work in progress. If he were to quit the project tomorrow, we have very little to show for our $260,000.00 investment.

This needs resolved ASAP because we do not want to hold up his receiving of necessary funds but this is not going to work. Please advise.

Thereafter, on November 12, 2015, Mrs. Miller[7] sent another email addressed to Ms.

Hamilton and the Residential Construction Lending department, which stated that,

Brad and I have spoken at length with Derrick Pritt Wednesday afternoon. He better explained to us how the draw schedules are structured and how, for example, the foundation draw has the construction of the foundation as a bench mark but actually includes costing for a lot of other supplies, etc.; Those other items just don't show in our document that has a single line that states "Foundation . . . . . . $130,000.00."

Brad and I feel a lot more comfortable with the situation now and are prepared to sign the disbursement release documents *but wanted to be sure everything is good on your end before we do so as this seems contrary to what was explained to us by WesBanco.* It is my understanding that Derrick spoke with Michelle earlier this week and confirmed that the draw schedule was fine with you all but we would appreciate if you could confirm this before we send off the signed documents.

(Emphasis added). Also, on November 12, 2015, Ms. Hamilton responded with an email

to Mrs. Miller, which related that Ms. Hamilton

replied to Derrick's email that the draw schedule was approved by our residential lending department as it was presented to us in the contract but have not spoken to him directly.

I apologize on all the confusion but I did explain to you that we do not fund for work that has not been completed. That is why we require a draw schedule to be presented to us and approved with the construction loan. When disbursing funds we follow the approved draw schedule sent to us. Before we release funds

---

[7] The sender's name on this email is "Jamie L. Brewer"; however, during her trial testimony, Mrs. Miller stated that she sent this email and that Brewer is her maiden name.

10

we have the appraiser go to the property to verify that the specific work relating to the draw schedule has been completed. We do not require the builder to supply us specifics as to what is included within each draw. As an example, we will release the funds for the foundation when the appraiser verifies the foundation is complete, as that is what is listed for the first draw.

Finally, a short while later that same day, Ms. Hamilton sent an email to Mrs. Miller that stated the following:

I wanted to attach copies of the draw schedule that you actually sent to me. It was part of the contract between you and the builder. This is the draw schedule that was approved by us and all that we have received from the builder. This is also what Derrick referenced in his email to me that I advised was approved by our residential construction lending department.

I also wanted to include a copy of the Builder/Borrower Expectation[s] form signed by you and the builder which explains our policy on draws and how everything was explained to you at application time so hopefully this will eliminate anymore [*sic*] confusion as to how we expect the process to flow.

The Millers then executed two "Draw Funds Disbursement Authorization" forms on November 12, 2015, for Residential Creations' draw requests totaling $190,000. One form was for the amount of $130,000, and a second form was for the amount of $60,000. Thereafter, construction of the home continued, and additional draws were requested by Residential Creations and paid by WesBanco. Then, around May 2016, Mrs. Miller learned that Residential Creations had ceased construction on the Miller home, filed bankruptcy proceedings, and had failed to pay for more than $117,000 in materials used in the Miller home. The $117,000 in unpaid materials ultimately resulted in the filing of a mechanic's

lien against the Millers' house and property and a lawsuit against the Millers by the company that had provided the materials, O.C. Cluss Lumber Company.[8]  At this point, WesBanco had disbursed approximately $442,000 of the loan proceeds to Residential Creations,[9] which was approximately eighty percent of the Millers' $555,000 construction loan, yet a "Construction Progress Inspection Report" dated March 26, 2016, indicates that the Miller house was only fifty-three percent complete as of the last inspection.

As a consequence, the Millers had to fund the completion of their house on their own and had to choose lesser quality materials than they had contracted for with Residential Creations due to the resulting strain on their finances.  According to Mrs. Miller's testimony, the Millers paid $125,000 of their own funds and borrowed an additional amount of $162,000 from family members, for a total of $287,000[10] spent to complete their home.

---

[8] The O.C. Cluss litigation against the Millers remains pending in the Circuit Court of Marion County.

[9] Mrs. Miller acknowledged in her testimony that approximately $112,000 in loan funds had not been disbursed (WesBanco states that the undisbursed amount is $113,000).  The loan apparently was frozen by WesBanco after Residential Creations ceased construction and no further disbursements were made.

[10] WesBanco refers to the Millers' expenditures as $287,500, and, in some parts of their argument, the Millers use the figure of $287,500 as well.

On April 20, 2017, the Millers filed suit against WesBanco alleging the following four counts: Count I, breach of contract; Count II, negligence; Count III, gross negligence in the performance of duties in a special relationship; and Count IV, violation of a trust relationship. WesBanco filed two separate motions seeking to dismiss Counts I, II, and III of the Millers' complaint. Following a hearing on the motions, and by order entered on March 13, 2018, the circuit court granted WesBanco's first motion to dismiss as to the Millers' tort claims asserted in Counts II and III of their complaint. In the same order, the circuit court found that WesBanco's second motion to dismiss was converted to a motion for summary judgment because WesBanco asked the court to consider documents outside the pleadings. The circuit court found tension between documents relied on by WesBanco[11] and the Construction Loan Agreement. Having found that this tension resulted in genuine issues of material fact, the circuit court denied summary judgment.

---

[11] WesBanco relied upon a release that was contained in the "Draw Funds Disbursement Authorization" signed by the Millers in connection with each draw request. The circuit court's order indicated that the release language was contained in the Expectations form. However, WesBanco's second motion to dismiss, while referring to the Expectations form, notes that the release language is in the "Draw Funds Disbursement Authorization" form:

> In paragraph 10 of the Complaint, Plaintiffs reference a document entitled WesBanco Bank, Inc. Mortgage Loan Department Expectations: Borrower/Builder. This document requires that Plaintiffs sign an Authorization to Draw Funds. The Draw Funds Disbursement Authorization forms that were signed by Plaintiffs include [release language].

(Footnote omitted).

13

In February 2019, WesBanco filed a motion for summary judgment. In denying the motion, the circuit court explained:

In its March 13, 2018 Order on WesBanco's Motion to Dismiss, the Court observed that there existed "tension between the release on which WesBanco relies and its contractual obligations under the original construction loan agreement." The Court agrees with the plaintiffs that that same sort of tension also exists with the "Expectations" form, and that there remain questions of fact which preclude the granting of WesBanco's Motion for Summary Judgment.

2. WesBanco maintains that the "if deemed necessary" language in paragraph 4.B.(i) of the loan agreement renders WesBanco's obligations thereunder discretionary. Given the facts of this case, a jury could conclude that WesBanco abused its discretion in its obligation to assure that "sufficient construction has occurred to support the amount of draw requested." The Court also agrees with the Plaintiffs that the language in paragraph 4.C.(ii) of the loan agreement is ambiguous and contradictory.

3. The Court finds that under West Virginia law there is an implied "covenant of good faith and fair dealing in every contract for purposes of evaluating a party's performance of that contract." *Evans v. United Bank, Inc.*, 235 W. Va. 619, 628, 775 S.E.2d 500, 509 (2015) . . . .

4. With respect to the "Expectations" form, which states that "funds will not be disbursed for work not completed," the November 2015 exchange of e-mails between Ms. Miller and Michelle Hamilton reveals that both the Millers and WesBanco acknowledged the vitality [*sic*] of the ["E]xpectations["] form, even post-contract. Having acknowledged that its obligations under the "Expectations" form existed in November of 2015, the finder of fact could conclude that the parties, by their conduct, adopted that "Expectations" form as a term of the loan agreement.

5. If the jury resolves the questions of fact identified above in favor of the plaintiffs, then, contrary to

14

WesBanco's argument, the rights which the plaintiffs assert would not be inconsistent with the terms of the contract[,] and the good faith and fair dealing obligation could fairly be imposed upon the defendant.

Thereafter, WesBanco filed two motions in limine: one seeking to preclude the Millers from offering parol evidence to vary the parties' allegedly unambiguous agreement expressed in the Construction Loan Agreement and Loan Addendum, and the second seeking to prevent the Millers from "offering argument or evidence that the [C]onstruction [L]oan [A]greement between the Millers and WesBanco consists of anything other than the October 22, 2015, Construction Loan Agreement and Loan Addendum." The circuit court addressed the motions on the record on the first day of trial and denied them both.

The trial proceeded with the Millers' themselves offering testimony, along with testimony from other witnesses, including Ms. Hamilton and Cathi McClelland, a vice president and manager of WesBanco's Residential Construction Lending Department. The circuit court allowed the witnesses to be questioned about the Construction Loan Agreement, the Expectations form, several forms required in connection with draw requests, and the various discussions and emails that were exchanged between Mrs. Miller and WesBanco in relation to the initial draw request by Residential Creations. Rather than call its own witnesses, WesBanco presented its case through extensive cross examination of Ms. McClelland. At the close of the evidence, WesBanco moved for judgment as a

matter of law pursuant to Rule 50(a) of the West Virginia Rules of Civil Procedure, which was denied by the circuit court. Following its deliberations, the jury returned a verdict in favor of the Millers and awarded them $404,500 in damages.

The Millers then submitted a proposed judgment order that granted them prejudgment interest in the amount of $89,664.04. WesBanco objected to the Millers' proposed judgment order and argued that, because the Millers had failed to demand a jury instruction on prejudgment interest, they had waived the right to such an award. The circuit court agreed and entered a judgment order on September 6, 2019, that did not include any award of prejudgment interest. The Millers subsequently filed a motion to alter or amend judgment under West Virginia Rule of Civil Procedure 59(e), and WesBanco filed a "Renewed Motion for Judgment as a Matter of Law, or in the Alternative, for a New Trial or Remittitur," pursuant to West Virginia Rules of Civil Procedure 50(b) and 59(a). By order entered on December 18, 2019, the circuit court denied the motions. Separate appeals by the Millers and WesBanco followed, which were consolidated for purposes of our review. We first will address the Millers' appeal, including a discussion of the appropriate standard for our review of the same. We then will resolve WesBanco's appeal, likewise setting out the standard of review applicable to the issues raised in connection with our discussion of that appeal.

## NO. 20-0041
### *MILLER v. WESBANCO BANK, INC.*

The Millers assert a single assignment of error in which they argue that the trial court erred and applied an incorrect statute in failing to award them prejudgment interest.

### *A. Standard of Review*

The Millers appeal the circuit court's denial of their motion to alter or amend judgment.

> The standard of review applicable to an appeal from a motion to alter or amend a judgment, made pursuant to W. Va. R. Civ. P. 59(e), is the same standard that would apply to the underlying judgment upon which the motion is based and from which the appeal to this Court is filed.

Syl. pt. 1, *Wickland v. Am. Travellers Life Ins. Co.*, 204 W. Va. 430, 513 S.E.2d 657 (1998). The issue raised by the Millers is a question of law involving the interpretation of statutes. "Where the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review." Syl. pt. 1, *Crystal R.M. v. Charlie A.L.*, 194 W. Va. 138, 459 S.E.2d 415 (1995). *See also State Farm Mut. Auto. Ins. Co. v. Rutherford*, 229 W. Va. 73, 76, 726 S.E.2d 41, 44 (2011) (finding that "the proper way to determine the amount of prejudgment interest on a judgment or decree . . . is a question of law"). Accordingly, we give plenary consideration to the issue raised by the Millers.

### *B. Discussion*

In their post-trial motion to alter or amend judgment, the Millers argued that the circuit court had the authority to award them prejudgment interest pursuant to West Virginia Code section 56-6-31(b) (eff. 2018). The circuit court denied the motion and opined that

> West Virginia Code § 56-6-27 provides the plaintiffs with the exclusive means by which, in this contract case, they are permitted to obtain an award of pre-judgment interest on the jury's verdict. By not complying with the requirements of that statute and submitting the issue to the trial jury for its consideration, plaintiffs waived their right to pre-judgment interest on the jury's verdict.

The Millers contend that the circuit court improperly applied outdated case law to conclude that West Virginia Code section 56-6-31(b) does not apply to prejudgment interest in contract actions. WesBanco argues that the circuit court properly applied West Virginia Code section 56-6-27 (eff. 1923), which is the exclusive source for an award of prejudgment interest in breach-of-contract cases. As we explain below, we find the circuit court correctly found that section 56-6-27 provides the exclusive method by which a party may seek prejudgment interest in an action founded on contract.

Because this issue requires us to consider two conflicting statutes to determine which properly governs the request for prejudgment interest in this case, we are mindful that, "[t]he primary object in construing a statute is to ascertain and give effect to the intent of the Legislature." Syl. pt. 1, *Smith v. State Workmen's Comp. Comm'r*, 159

18

W. Va. 108, 219 S.E.2d 361 (1975). Thus, where the legislative intent is plainly expressed, we are bound to apply rather than interpret the statute in question. "A statutory provision [that] is clear and unambiguous and plainly expresses the legislative intent will not be interpreted by the courts but will be given full force and effect." Syl. pt. 2, *State v. Epperly*, 135 W. Va. 877, 65 S.E.2d 488 (1951). On the other hand, "[a] statute that is ambiguous must be construed before it can be applied." Syl. pt. 1, *Farley v. Buckalew*, 186 W. Va. 693, 414 S.E.2d 454 (1992). Guided by these tenets, we consider which statute governs a request for prejudgment interest in a breach-of-contract claim: West Virginia Code section 56-6-31(b) or West Virginia Code section 56-6-27.

West Virginia Code section 56-6-31(b) provides in relevant part as follows:

> **Prejudgment** – In any judgment or decree that contains special damages, as defined below, or for liquidated damages, *the court may award prejudgment interest* on all or some of the amount of the special or liquidated damages, as calculated after the amount of any settlements. Any such amounts of special or liquidated damages shall bear simple, not compounding, interest. Special damages include lost wages and income, medical expenses, damages to tangible personal property and similar out-of-pocket expenditures, as determined by the court. If an obligation is based upon a written agreement, the obligation bears prejudgment interest at the rate and terms set forth in the written agreement until the date the judgment or decree is entered and, after that, the judgment interest is the same rate as provided for below in subsection (c) of this section.

(Emphasis added). On its face, this provision would seem to apply to the prejudgment interest sought by the Millers, and would place the decision of whether to award such

19

interest squarely within the discretion of the presiding court. However, we may not limit our analysis to considering this single provision in isolation. "Statutes which relate to the same persons or things, or to the same class of persons or things, or statutes which have a common purpose will be regarded in *pari materia* to assure recognition and implementation of the legislative intent." Syl. pt. 5, in part, *Fruehauf Corp. v. Huntington Moving & Storage Co.*, 159 W. Va. 14, 217 S.E.2d 907 (1975). Article 6 of Chapter 56 of the West Virginia Code contains another provision related to interest that adds clarity to our search for legislative intent as it relates to the instant dispute. This provision addresses the question of interest in a jury trial founded on contract, and provides that

> [*t*]*he jury*, in any action founded on contract, *may allow* interest on the principal due, or any part thereof, and in all cases they shall find the aggregate of principal and interest due at the time of the trial, after allowing all proper credits, payments and sets-off; and judgment shall be entered for such aggregate with interest from the date of the verdict.

W. Va. Code § 56-6-27 (emphasis added). Notably, the plain language of this provision places the question of whether to allow prejudgment interest in an action founded on contract with the jury. Furthermore, this Court previously has acknowledged that "West Virginia Code § 56-6-27 . . . is the general authority for awarding prejudgment interest in a contract action." *CMC Enter., Inc. v. Ken Lowe Mgmt. Co.*, 206 W. Va. 414, 418, 525 S.E.2d 295, 299 (1999) (per curiam). *See also First Nat'l Bank of Bluefield v. Clark*, 191 W. Va. 623, 625, 447 S.E.2d 558, 560 (1994) (per curiam) ("General authority for awarding prejudgment interest in a contract action in West Virginia is contained in W. Va. Code § 56-6-27.").

20

Thus, we are presented with two conflicting statutory provisions that could potentially apply to awarding prejudgment interest in an action sounding in contract, one that clearly places the decision with the court, and one that unmistakably places the question with the jury. Our task is to determine which one the Legislature intends to apply.

Prior to a 2006 amendment of West Virginia Code section 56-6-31, this Court addressed this very issue. The earlier version of section 56-6-31 provided as follows:

> Except where it is otherwise provided by law, every judgment or decree for the payment of money entered by any court of this State shall bear interest from the date thereof, whether it be so stated in the judgment or decree or not: Provided, that if the judgment or decree, or any part thereof, is for special damages, as defined below, or for liquidated damages, the amount of such special or liquidated damages shall bear interest from the date the right to bring the same shall have accrued, as determined by the court. Special damages includes lost wages and income, medical expenses, damages to tangible personal property, and similar out-of-pocket expenditures, as determined by the court. The rate of interest shall be ten dollars upon one hundred dollars per annum, and proportionately for a greater or lesser sum, or for a longer or shorter time, notwithstanding any other provisions of law.

W. Va. Code § 56-6-31 (eff. 1981). Reconciling the forgoing provision with section 56-6-27, this Court held,

> [i]n an action founded on contract, a claimant is entitled to have the jury instructed that interest may be allowed on the principal due, *W. Va. Code*, 56-6-27 [1923], but is not entitled to the mandatory award of interest contemplated by *W. Va. Code*, 56-6-31 [1981], since this statute does not apply where the rule concerning interest is otherwise provided by law.

21

Syl. pt. 4, *Thompson v. Stuckey*, 171 W. Va. 483, 300 S.E.2d 295 (1983). The question before the *Stuckey* Court also pertained to prejudgment interest, and the Court concluded that "[s]ince this action was 'founded on contract,' we consider *Code*, 56-6-27 [1923] to apply to the matter of prejudgment interest, and not Code, 56-6-31 [1981], which by its own terms only applies where the rule concerning interest is not otherwise provided by law." *Id.* at 488, 300 S.E.2d at 300.

In 2006, section 56-6-31 was amended. The amendment added language referring to actions in contract and also retained the qualification "[e]xcept where it is otherwise provided by law." W. Va. Code § 56-6-31 (eff. 2006). Under the relevant portion of the 2006 version,

> [e]xcept where it is otherwise provided by law, every judgment or decree for the payment of money, whether in an action sounding in tort, contract or otherwise, entered by any court of this State shall bear interest from the date thereof, whether it be so stated in the judgment or decree or not . . . .

W. Va. Code § 56-6-31(a). Following this amendment, this Court continued to apply *Stuckey*, and continued to find section 56-6-27 was the governing statute addressing prejudgment interest in breach-of-contract cases:

> When this Court decided *Stuckey*, West Virginia Code § 56-6-31 did not include the language "whether in an action sounding in tort, contract or otherwise." This language was added when the statute was amended in 2006. Despite the insertion of this language, the phrase "[e]xcept where it is otherwise provided by law" was retained. Accordingly, we do not find that this statutory amendment provides any basis to revisit our holding in *Stuckey*.

22

*Ringer v. John*, 230 W. Va. 687, 691 n.6, 742 S.E.2d 103, 107 n.6 (2013) (per curiam) (concluding that circuit court erred by awarding prejudgment interest pursuant to West Virginia Code section 56-6-31 instead of allowing jury to make determination under West Virginia Code section 56-6-27).

Most recently, in 2017, section 56-6-31 was again amended, with the amendment taking effect on January 1, 2018. The exclusionary phrase "except where it is otherwise provided by law" was again retained, though placed in a separate paragraph from the provision related to prejudgment interest:

> (a) Except where it is otherwise provided by law, every judgment or decree for the payment of money, whether in an action sounding in tort, contract, or otherwise, entered by any court of this state shall bear simple, not compounding, interest, whether it is stated in the judgment decree or not.

> (b) **Prejudgment** – In any judgment or decree that contains special damages, as defined below, or for liquidated damages, the court may award prejudgment interest on all or some of the amount of the special or liquidated damages, as calculated after the amount of any settlements. Any such amounts of special or liquidated damages shall bear simple, not compounding, interest. . . .

W. Va. Code § 56-6-31 (eff. 2018). Under this latest iteration, it is apparent that the "[e]xcept where it is otherwise provided by law" limitation applies specifically to the provision clarifying that judgments will, in general, bear simple interest. W. Va. Code § 56-6-31(a). Paragraph (b), which relates to prejudgment interest, does not contain the restrictive language. Notably, however, it also fails to contain any language expressly

23

stating that it applies to actions founded in contract. Thus, we remain faced with conflicting statutes that ostensibly apply to the same subject. One is a general prejudgment interest statute, section 56-6-31(b), that applies to "any judgment or decree." The other is a more particular statute, section 56-6-27, that applies "in any action founded on contract." In these circumstances, the specific statute governs. "The general rule of statutory construction requires that a specific statute be given precedence over a general statute relating to the same subject matter where the two cannot be reconciled." Syl. pt. 1, *UMWA by Trumka v. Kingdon*, 174 W. Va. 330, 325 S.E.2d 120 (1984). Here, West Virginia Code section 56-6-27 is the more specific statute in that it expressly applies to "any action founded on contract." W. Va. Code § 56-6-27. *See, e.g.*, *Tri-State Petroleum Corp. v. Coyne*, 240 W. Va. 542, 566 n.87, 814 S.E.2d 205, 229 n.87 (2018) (addressing prejudgment interest in tort action, but nevertheless acknowledging that "West Virginia Code § 56-6-27 . . . controls awards of prejudgment interest in cases founded in contract").

We are further persuaded that the Legislature intends section 56-6-27 to govern prejudgment interest in actions founded on contract by the fact that, despite this Court's prior holdings that section 56-6-27 provides the method of obtaining prejudgment interest in contract actions, i.e. by requesting the same from the jury, the Legislature never repealed section 56-6-27 when it amended section 56-6-31. *Cf.* Syl. pt. 5, *Pullano v. City of Bluefield*, 176 W. Va. 198, 342 S.E.2d 164 (1986) ("'The Legislature, when it enacts legislation, is presumed to know its prior enactments.' Syllabus Point 12, *Vest v. Cobb*,

24

138 W. Va. 660, 76 S.E.2d 885 (1953)."); *In re Grandparent Visitation of Cathy L.(R.)M. v. Mark Brent R.*, 217 W. Va. 319, 325, 617 S.E.2d 866, 872 (2005) (per curiam) ("'[I]t is a recognized principle that where a statute has been interpreted by the courts, the continued use of the same language by the Legislature subsequent to the judicial interpretation is indicative that the legislative intent has been correctly ascertained[.] . . .'" (quoting *Knight-Ridder Broadcasting, Inc. v. Greenberg*, 511 N.E.2d 1116, 1119 (1987)) (additional citations omitted)).

Based upon the foregoing analysis, we now hold that West Virginia Code section 56-6-27 (eff. 1923) provides the exclusive means by which to obtain prejudgment interest in any action founded on contract. Failure to submit the question of prejudgment interest to the jury results in waiver of the same. Because the Millers failed to submit the question of prejudgment interest to the jury, the circuit court did not err in denying their Rule 59(e) motion to alter or amend.[12]

---

[12] Although we conclude that the circuit court did not err in denying the Millers' Rule 59(e) motion due to their failure to submit the question of prejudgment interest to the jury during the trial underlying this appeal, insofar as we are remanding this matter for a new trial on damages, the Millers will have another opportunity to comply with West Virginia Code section 56-6-27.

## III.

### NO. 20-0042
### *WESBANCO BANK, INC. v. MILLER*

WesBanco raises four assignments of error. WesBanco first assigns error to the circuit court's admission of parol evidence in relation to the Construction Loan Agreement rather than relying on the plain language used therein. WesBanco next claims that the circuit court improperly allowed the Millers to rely on the duty of good faith and fair dealing to modify WesBanco's contractual obligations. In its third assignment of error, WesBanco argues that the circuit court erred in denying its motion for judgment as a matter of law because the Millers failed to establish a prima facia case as to their breach-of-contract claims and resultant damages. Finally, WesBanco argues that the jury's damages award of $404,500 was against the clear weight of the evidence. After setting out the proper standard for our review of these issues, we will address each one in turn.

### *A. Standard of Review*

WesBanco appeals from the circuit court's order denying its "Renewed Motion for Judgment as a Matter of Law, or in the Alternative, for a New Trial or Remittitur," which it sought pursuant to West Virginia Rules of Civil Procedure 50(b) and 59(a). "The appellate standard of review for an order granting or denying a renewed motion for a judgment as a matter of law after trial pursuant to Rule 50(b) of the *West Virginia Rules of Civil Procedure* [1998] is *de novo*." Syl. pt. 1, *Fredeking v. Tyler*, 224 W. Va. 1, 680 S.E.2d 16 (2009). Moreover,

[w]hen this Court reviews a trial court's order granting or denying a renewed motion for judgment as a matter of law after trial under Rule 50(b) of the *West Virginia Rules of Civil Procedure* [1998], it is not the task of this Court to review the facts to determine how it would have ruled on the evidence presented. Instead, its task is to determine whether the evidence was such that a reasonable trier of fact might have reached the decision below. Thus, when considering a ruling on a renewed motion for judgment as a matter of law after trial, the evidence must be viewed in the light most favorable to the nonmoving party.

Syl. pt. 2, *Fredeking*, *id.* We have further explained that

[i]n determining whether there is sufficient evidence to support a jury verdict the court should: (1) consider the evidence most favorable to the prevailing party; (2) assume that all conflicts in the evidence were resolved by the jury in favor of the prevailing party; (3) assume as proved all facts which the prevailing party's evidence tends to prove; and (4) give to the prevailing party the benefit of all favorable inferences which reasonably may be drawn from the facts proved.

Syl. pt. 5, *Orr v. Crowder*, 173 W. Va. 335, 315 S.E.2d 593 (1983).

We review the circuit court's denial of WesBanco's motion for a new trial under an abuse of discretion standard.

[I]t is well-established that "'[a]lthough the ruling of a trial court in granting or denying a motion for a new trial is entitled to great respect and weight, the trial court's ruling will be reversed on appeal when it is clear that the trial court has acted under some misapprehension of the law or the evidence.' Syllabus point 4, *Sanders v. Georgia-Pacific Corp.*, 159 W. Va. 621, 225 S.E.2d 218 (1976)." Syllabus Point 3, *Carpenter v. Luke*, 225 W. Va. 35, 689 S.E.2d 247 (2009). In other words, our standard of review for a trial court's decision regarding a motion for a new trial is abuse of discretion.

27

*Marsch v. American Elec. Power Co.*, 207 W. Va. 174, 180, 530 S.E.2d 173, 179 (1999).

*MacDonald v. City Hosp., Inc.*, 227 W. Va. 707, 715, 715 S.E.2d 405, 413 (2011). *See also Lunsford v. Shy*, 243 W. Va. 175, ___, 842 S.E.2d 728, 734 (2020) ("[A]s a general proposition, we review a circuit court's rulings on a motion for a new trial under an abuse of discretion standard." (quoting *Tennant v. Marion Health Care Found., Inc.*, 194 W. Va. 97, 104, 459 S.E.2d 374, 381 (1995)). We will apply these standards in considering the issues raised by WesBanco, our discussion of which follows.

### B. Discussion

**1. Parol Evidence.** Prior to trial, WesBanco submitted two motions in limine asking the court to define the parties' contract as the Construction Loan Agreement and to exclude evidence that would supplement, amend, or contradict that agreement. The circuit court denied these motions based, in part, upon an ambiguity in paragraph 4C of the contract, which pertained to lien waivers,[13] and also based upon conflict among various documents that were part of the transaction between the Millers and WesBanco:

---

[13] The referred to provisions of paragraph 4(C) provide as follows:

C.) After depletion of the Borrower's portion of the contract price specified above towards the construction of the proposed improvements, Lender shall, upon application of the Borrower make periodic disbursements to the Borrower for payment for work actually performed, materials delivered, or materials for the delivery of which the [B]orrower has entered into an agreement, provided:

28

The Court [is] of the opinion and has previously opined that language of the loan agreement, particularly paragraph 4-C-[ii] is ambiguous and contradictory. There exists an implied covenant of good faith and fair dealing. That a tension exists between the release,[14] the expectations form, and the construction loan agreement, and that the jury can conclude that the parties by their conduct adopted the expectations form as a term of the contract.

In its first assignment of error, WesBanco argues that the circuit court erred by allowing the jury to hear parol evidence that varied and contradicted the parties' Construction Loan Agreement.[15] WesBanco complains that the circuit court relied on an

---

(i) That the initial request for disbursement of the proceeds of the loan shall be accompanied by the executed waiver of lien forms signed by all contractors, subcontractors, and materialmen who furnished labor or materials to the site prior to the initial advance;

(ii) That all subsequent disbursements shall have been approved by the Construction Loan Department, to the effect that the improvements are being completed in accordance with the predetermined schedule for utilization of the contract price and shall be accompanied by the executed waiver of lien forms signed by all contractors, subcontractors, and materialmen who furnished labor or materials to the site prior to the initial advance[.]

[14] As we noted previously, this "release" is contained in the "Draw Funds Disbursement Authorization" signed by the Millers in connection with each draw request. *See supra* note 11.

[15] WesBanco contends that an unambiguous written contract is fully integrated. To support this argument, WesBanco quotes Syllabus point 2 of *Kanawha Banking & Trust Co. v. Gilbert*, 131 W. Va. 88, 46 S.E.2d 225 (1947), which provides:

erroneous finding of ambiguity in paragraph 4(C)(ii) of the Construction Loan Agreement to improperly allow Michelle Hamilton, the former WesBanco loan originator who guided the Millers through the process of submitting their construction loan application to WesBanco, to testify about her pre-loan discussions with the Millers regarding lien waivers. WesBanco further contends that the lower court erred by relying on this perceived ambiguity to allow evidence of an email exchange between Ms. Hamilton and the Millers that occurred after closing on the Construction Loan Agreement and that included an attached copy of the Expectations form.[16] WesBanco then complains that, based upon the circuit court's erroneous findings of ambiguity, Mrs. Miller was improperly permitted to testify that there were multiple documents included in the Millers' loan contract with

---

> An unambiguous written contract entered into *as the result of verbal or written negotiations* will, in the absence of fraud or mistake, be conclusively presumed to contain the final agreement of the parties to it, and such contract may not be varied, contradicted or explained by extrinsic evidence of conversations had or statements made contemporaneously with or prior to its execution.

(Emphasis added). The presumption that a written contract contains a final agreement that may not be explained by extrinsic evidence does not appear to apply in this instance. WesBanco points to nothing in the record to show that the Construction Loan Agreement between the Millers and WesBanco was the product of verbal or written negotiations.

[16] This email exchange was initiated by the Millers' inquiry about draw payments.

WesBanco, and that the document titled "Construction Loan Agreement" was just one of them.[17]

The Millers contend that separate written instruments in a given transaction will typically be construed together. Thus, the parties' contract here consisted of more than only the Construction Loan Agreement. They contend that the various documents that were part of their transaction with WesBanco are properly considered part of the contract. We agree with the Millers that their contract with WesBanco was not limited to only the Construction Loan Agreement.

This Court has adopted the single transaction rule, holding that

> "'[s]eparate written instruments will be construed together and considered to constitute one transaction where the parties and the subject matter are the same, and where there is clearly a relationship between the documents.' Syllabus point 3, *McCartney v. Coberly*, ___ W. Va. ___, 250 S.E.2d 777 (1978), *overruled on other grounds by* Syllabus point 2, *Overfield v. Collins*, 199 W. Va. 27, 483 S.E.2d 27 (1996)." Syl. Pt. 1, *McDaniel v. Kleiss*, 202 W. Va. 272, 273-74, 503 S.E.2d 840, 841-42 (1998).

---

[17] WesBanco additionally appears to argue that the circuit court erred in allowing evidence related to mechanic's liens; however, that evidence is mentioned only in passing and without analysis. Therefore, we focus our discussion on the lien waiver provisions of the parties' agreement and deem WesBanco's other complaints inadequately briefed. *See Tiernan v. Charleston Area Med. Ctr., Inc.*, 203 W. Va. 135, 140 n.10, 506 S.E.2d 578, 583 n.10 (1998) ("Issues not raised on appeal or merely mentioned in passing are deemed waived." (citation omitted)).

Syl. pt. 3, *TD Auto Fin. LLC v. Reynolds*, 243 W. Va. 230, 842 S.E.2d 783 (2020). WesBanco contends that this holding is not applicable to the circumstances herein presented because the documents do not share the same parties and subject matter, and they were not executed contemporaneously. We disagree. When this Court recently applied the foregoing holding in *TD Auto*, we concluded that the separate instruments at issue in that case were not part of a single transaction and, therefore, could not be construed together. However, the instant matter is easily distinguishable from the circumstances presented in *TD Auto*.

*TD Auto* pertained to the purchase of a vehicle. The issue before the Court was whether an arbitration provision agreed to in a credit application executed by the buyers survived a merger clause[18] contained in a subsequently executed Retail Installment Sales Contract ("RISC"). The merger clause stated that the RISC constituted the "'entire

---

[18] With respect to merger clauses,

> [t]his Court has explained that "[a] 'merger clause' is '[a] provision in a contract to the effect that the written terms may not be varied by prior or oral agreements because all such agreements have been merged into the written document.'" *Frederick Bus. Properties Co. v. Peoples Drug Stores, Inc.*, 191 W. Va. 235, 240 n.2, 445 S.E.2d 176, 181 n.2 (1994) (quoting Black's Law Dictionary 989 (6th ed. 1990)).

*TD Auto Fin. LLC v. Reynolds*, 243 W. Va. 230, 234-35, 842 S.E.2d 783, 787-88 (2020).

agreement'" between the buyers and the dealer, Crossroads Chevrolet ("Dealer" or "Crossroads"). *TD Auto*, 243 W. Va. at 234, 842 S.E.2d at 787.

The *TD Auto* Court concluded that the arbitration provision did not survive the merger clause. The Court's decision was based on two factors: first, the credit application, which contained the arbitration clause, was signed before, rather than contemporaneously with, the RISC;[19] second, the subject matter of the credit application was distinct from the purchasing documents. *Id.* at 237, 842 S.E.2d at 790. Focusing primarily on the different purposes of the credit application and the RISC, the Court explained that

> [t]he credit application is merely an authorization to investigate respondents' credit score and employment information and present that information to various finance companies to determine which company may wish to extend financing to them. The credit application is not part of the purchase transaction documentation and governs an entirely different subject matter—the credit investigation and approval process. There is nothing about a simple credit application which ostensibly purports to govern any of the terms of the ultimate vehicle purchase or financing.

*Id.* The Court explained further that,

> while the credit application may have been a common precursor to a vehicle purchase governed by a RISC, the completely different subject matter of the two documents and lack of contemporaneous execution—which also demonstrates their distinct purposes—are insufficient to view them as part of a single transaction. Therefore, the RISC and its merger

---

[19] The RISC also contained an assignment of the contract from Crossroads to TD Auto.

clause—stating that it represents the "entire agreement" between the parties as pertains to the purchase of the vehicle—must govern.

*Id*. at 238, 842 S.E.2d at 791. The instant matter differs significantly from the circumstances presented in *TD Auto*.

First, there is no merger clause at issue in this case to indicate that WesBanco and the Millers intended the Construction Loan Agreement to represent a merger of all prior agreements executed in their construction loan transaction. In fact, the Construction Loan Agreement, itself, references various other documents, providing a clear indication that it was not intended to represent the entirety of the agreement between the Millers and WesBanco.[20] Moreover, unlike the credit application in *TD Auto*, which addressed a

---

[20] The Construction Loan Agreement states that,

[s]imultaneously with the execution and delivery of this Agreement, the Borrower has executed and delivered to the Lender, among other documents, 1.) a Note of even date in the principal amount of $555,000.00 (including a Construction Loan Addendum to the Note), 2.) and a Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of even date securing the Note and other indebtedness, 3.) an executed copy of the building/construction contract, 4.) a complete set of the plans and specifications for the proposed improvement, each dated and initialed, respectively, by the Borrower and Contractor, 5.) the breakdown of the contract price showing the amount allocated to various sub-bids for masonry work and material, carpentry work and material, plumbing work and material, electrical work and material, and any other sub-bids, and [*sic*] 6.) a draw schedule unless specifically set forth in the building/construction contract, and 7.) any documents as set forth in Section 1 below.

completely different subject matter from the purchase of the automobile, the Expectations form at issue in this case is directly related to the Construction Loan Agreement in that it expressly addresses how requests to draw funds under the Construction Loan Agreement were to be made and how those funds would be disbursed by WesBanco. Importantly, the first line of the Expectations form specifies that "[f]ailure to make the [B]orrower(s) and their builder aware of this information may result in a delayed closing or first draw." Thus, this document had a direct impact on the Millers' transaction with WesBanco, including the potential to cause a delay in closing the loan or affecting the first draw of funds if it was not properly executed. Indeed, former WesBanco employee Ms. Hamilton testified that WesBanco would not have conducted the loan closing without the Millers and their contractor first executing the Expectations form:

> Q.     Would the loan be allowed or able to proceed in the absence of that document that you're holding [the Expectations form] being signed?
>
> A.     Not that I'm aware. It was required to be signed before the construction loan.
>
> Q.     And you've never heard of a closing proceeding without that document first being signed by the borrowers; is that right?
>
> A.     That's correct.

And, while WesBanco is not a signatory to the Expectations form, its title clearly displays that it is WesBanco's form:

Likewise, Ms. Hamilton testified that it "was a WesBanco generated form required for all construction loans." Furthermore, WesBanco followed the requirements of the form in connection with draw requests. WesBanco has asserted that it did not release any funds without first receiving four documents: (1) a Builder's lien waiver; (2) a Builder's Affidavit; (3) an Inspection Report; and (4) the Millers' signed authorization. Notably, it is the Expectations form, not the Construction Loan Agreement, that lists these four documents and expressly states that "[a]ll draw requests will be supported by" them. Therefore, unlike the credit application in *TD Auto*, the Expectations form was an integral part of the transaction between WesBanco and the Millers.

The less significant factor considered in *TD Auto* was the fact that the documents at issue in that case were not contemporaneously executed. However, even though this Court has discussed the contemporaneous execution of documents when analyzing the single transaction rule, there actually is no such requirement included in our holding adopting that rule. *See* Syl. pt. 3, *TD Auto*, 243 W. Va. 230, 842 S.E.2d 783 ("Separate written instruments will be construed together and considered to constitute one transaction where the parties and the subject matter are the same, and where there is clearly a relationship between the documents." (additional quotations and citations omitted)). Moreover, various courts have concluded that, in certain circumstances, the single

36

transaction rule applies even where documents were executed at different times and/or by different parties. *See, e.g.*, *SBKC Serv. Corp. v. 1111 Prospect Partners, L.P.*, 153 F.3d 728, 1998 WL 436579, at *3 (10th Cir. 1998) (table decision) ("Where we have several documents executed at different times, but in the course of the same transaction concerning the same subject matter, we construe them together to determine the intent of the parties."); *Barr v. Flagstar Bank, FSB*, 303 F. Supp. 3d 400, 413 (D. Md. 2018) ("Under Maryland law, if several documents are 'part of a single transaction' they 'will all be read and construed together as evidencing the intention of the parties in regard to the single transaction.' *Ford* [*v. Antwerpen Motorcars Ltd*., 117 A.3d 21, 27 (2015)] (quoting *Rocks v. Brosius*, 241 Md. 612, 217 A.2d 531, 545 (1966)). 'This is true even though the instruments were executed at different times and do not in terms refer to each other.' *Id.* at 27 (quoting *Rocks*, 217 A.2d at 545)."); *Nat'l Jockey Club v. Ganassi*, No. 04 3743, 2009 WL 2177217, at *12 (N.D. Ill. July 21, 2009) ("The [parol evidence] rule . . . 'does not bar contemporaneous written documents' or documents 'executed at different times as parts of the same transaction[.]'" (quoting *IFC Credit Corp. v. Burton Indus., Inc*., 536 F.3d 610, 614 (7th Cir. 2008))); *In re Fairfield Sentry Ltd*., No. 10-13164 (SMB), 2018 WL 3756343, at *11 (Bankr. S.D.N.Y. Aug. 6, 2018) ("Documents executed at different times may still be construed as a single contract if 'the parties assented to all the promises as a whole, so that there would have been no bargain whatever if any promise or set of promises had been stricken.'" (quoting *Commander Oil Corp. v. Advance Food Serv. Equip*., 991 F.2d 49, 53 (2d Cir. 1993)) (additional citations omitted)); *J.M. Montgomery Roofing Co. v. Fred*

*Howland, Inc.*, 98 So. 2d 484, 486 (Fla. 1957) ("While the situation does not fall strictly within the rule that where an agreement is evidenced by two or more writings, the writings must be construed together, it has been said that [t]his rule is not necessarily confined to instruments executed at the same time by the same parties for the same purpose; instruments entered into on different days, but concerning the same subject matter, may under some circumstances be regarded as one contract and interpreted together." (quotations and citation omitted)); *Lily, Inc. v. Silco, LLC*, 997 N.E.2d 1055, 1068 (Ind. Ct. App. 2013) ("Even if documents are executed at different times, they may still be construed together as long as they relate to the same transaction."); *Hollenbeck v. Household Bank*, 829 P.2d 903, 906 (Kan. 1992) ("Documents which are executed at different times, but in the course of the same transaction concerning the same subject matter, will be construed together to determine the intent of the parties to the contract."); *Hous. Mortg. Corp. v. Allied Constr. Inc.*, 97 A.2d 802, 805 (Pa. 1953) (acknowledging the terms of an agreement may be expressed in two or more separate documents and stating that "[t]his is true whether the documents are all executed by a single party or by two or more parties, and whether some of the documents are executed by parties who have no part in executing the others" (emphasis omitted)); *Baker v. Wilburn*, 456 N.W.2d 304, 306 (S.D. 1990) ("Where several writings are connected by internal references to each other, even if they were executed on different dates and were not among all of the same parties, they will constitute a single contract as long as they involve the same subject matter and prove to be parts of an entire transaction." (quotations and citation omitted)); *Left Gate Prop. Holding, LLC v. Nelson*,

38

No. 14-19-00247-CV, 2021 WL 1183863, at *4 (Tex. App. Mar. 30, 2021) (observing that "'instruments pertaining to the same transaction may be read together to ascertain the parties' intent, even if the parties executed the instruments at different times and the instruments do not expressly refer to each other, and . . . a court may determine, as a matter of law, that multiple documents comprise a written contract. In appropriate instances, courts may construe all the documents as if they were part of a single, unified instrument.'" (quoting *Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 840 (Tex. 2000))).

Based upon the foregoing discussion, we conclude that, under the circumstances presented in this case, the Expectations form was part and parcel of the construction loan transaction between the Millers and WesBanco. Having so found, we discern no error in the circuit court's decision allowing Mrs. Miller to testify that "[t]here are multiple parts to the agreement." Furthermore, the circuit court did not err in allowing parol evidence so that the jury could interpret the agreement as to lien waivers.

This Court has recognized the general rule that

> "[a] valid written instrument which expresses the intent of the parties in plain and unambiguous language is not subject to judicial construction or interpretation but will be applied and enforced according to such intent." Syl. pt. 1, *Cotiga Development Company v. United Fuel Gas Company*, 147 W. Va. 484, 128 S.E.2d 626 ([1962]).

39

Syl. pt. 1, *Sally-Mike Props. v. Yokum*, 175 W. Va. 296, 332 S.E.2d 597 (1985).  However, "[t]he determination of whether a deed, contract, or other writing is ambiguous and does not clearly express the intention of the parties is a question of law to be determined by the court."  Syl. pt. 3, *Harrell v. Cain*, 242 W. Va. 194, 832 S.E.2d 120 (2019).

> If a circuit court finds that a deed, contract, or other writing is ambiguous and does not clearly express the intention of the parties, then the proper interpretation of that ambiguous document, when the facts are in dispute, presents a question of fact for the factfinder to resolve after considering all relevant extrinsic evidence.

Syl. pt. 4, *id.*  Here we find no error in the circuit court's conclusion that the Construction Loan Agreement was ambiguous.  First, as the circuit court observed, paragraph 4(C)(ii) appears to contain an error.  Paragraph 4(C)(ii) requires that each draw request subsequent to the initial draw request be accompanied by the submission of lien waivers only from "contractors, subcontractors, and materialmen who furnished labor or materials to the site prior to the initial advance."  However, the lien waivers described in paragraph 4(C)(ii) are identical to the lien waivers described in paragraph 4(C)(i), which would already have been submitted to WesBanco in connection with the initial request for disbursement.  No reasonable explanation for WesBanco's need for duplicated lien waivers has been provided.  Furthermore, WesBanco claims that the Construction Loan Agreement requires lien waivers on only two occasions:  (1) in connection with the initial request for disbursement under paragraph 4(C)(i), and (2) at the final advance of the loan pursuant to

paragraph 6.[21]  These contractual provisions conflict with the Expectations form, under which "[a]ll draw requests will be supported by the following documentation: . . . Properly executed and notarized Lien Wavers must be presented by each sub contractor in addition to the general contractor."  This Court previously has held that,

> "where the meaning [of a writing] is uncertain and ambiguous, parol evidence is admissible to show the situation of the parties, the surrounding circumstances when the writing was made, and the practical construction given to the contract by the parties themselves either contemporaneously or subsequently . . . ."  Syl. Point 4, *Watson v. Buckhannon River Coal Co.*, 95 W. Va. 164, 120 S.E. 390 (1923).

Syl. pt. 1, in part, *Buckhannon Sales Co., Inc. v. Appalantic Corp.*, 175 W. Va. 742, 338 S.E.2d 222 (1985).  Given the ambiguities in the construction agreement between the Millers and WesBanco, the circuit court properly allowed parol evidence to clarify the intent of the parties with respect to the lien waivers.

**2.  Good Faith and Fair Dealing.**  WesBanco next argues that the trial court erred by allowing questions suggesting to the jury that it could apply the duty of good faith and fair dealing to vary and contradict the Construction Loan Agreement.  The Millers contend that there was substantial evidence presented to the jury throughout trial that

---

[21] Paragraph 6 of the Construction Loan Agreement pertains to the final advance of the Loan, and sets out multiple conditions that must be met before such final advance would be made, including that "the Lender has received the fully executed Waiver of Liens from all subcontractors, suppliers and materialmen and the Builder's Affidavit."  As WesBanco points out, the Millers' loan never reached the final advance due to Residential Creations' failure to complete the project.

41

WesBanco did not administer the Millers' loan in conformity with their justified expectations.  We find no error.

This Court has recognized that

"[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." *Restatement (Second) of Contracts* § 205 (1981).  "Good faith" means "honesty in fact and the observance of reasonable commercial standards of fair dealing." W. Va. Code § 46-1-201(20).  As the *Restatement (Second) of Contracts* § 205, cmt. d, puts it:

> Subterfuges and evasions violate the obligation of good faith in performance even though the actor believes his conduct to be justified.  But the obligation goes further: bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.  A complete catalogue of types of bad faith is impossible, but the following types are among those which have been recognized in judicial decisions: evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

*Mountaineer Fire & Rescue Equip., LLC v. City Nat'l Bank of W. Va.*, ___ W. Va. ___, ___ n.9, 854 S.E.2d 870, 891 n.9 (2020).

WesBanco contends that counsel for the Millers posed questions to WesBanco's corporate representative, Cathi McClelland, that suggested the jury could apply the duty of good faith and fair dealing to vary and contradict the Construction Loan

42

Agreement's provision related to mechanic's liens. Under paragraph 7 of the Construction Loan Agreement, "Borrower agrees that any mechanic's lien filed upon the property shall be Borrower's sole responsibility and hereby holds Lender harmless against all losses, including but not limited to, liability, costs, or damages resulting from same." The complained-of exchange occurred during trial as follows:

> Q.    Do you believe that that clause [paragraph 7] is subject to being interpreted under principles of good faith and fair dealing?

> MR. SCHAEFFER:    Objection, Your Honor.

> THE COURT:    Overruled.

> Q.    May I give you an example?

> A.    Please.

> Q.    Let's say that a mechanic's lien was identified, a supplier's lien, in fact, was identified by the bank, and the bank either didn't pay it or didn't pay it in the proper sum and the property owner had a lien filed against it. Do you think that it would be within the parameters of good faith and fair dealing to interpret this contract language to say this is your responsibility, owner?

> [Bench conference addressing objection by WesBanco]

> Q.    Ms. McClelland, does WesBanco, and then you specifically when you're working on residential construction loans, try to act in good faith?

> A.    Yes.

> Q.    Okay. And do you try to deal fairly with your customers?

> A.    Yes.

43

. . . .

> Q.     And so what I'm asking you, is that clause number 7 . . . do you believe that you would be acting in good faith and fair dealing if WesBanco did not perform a condition and have the duty to perform under the contract in regards to a mechanic's lien and then could fall back on the language that we told you, it's on you?  Would that be fair?
>
> A.     I believe it would be.

Although not referred to by WesBanco, the exchanged continued as follows:

> Q.     All right.  And do you think that that would be acting in good faith?  And again, if WesBanco failed to do something that they should have done in regards to a mechanic's lien to say, oops, here, look at clause number 7, I'm sorry we didn't do what we were supposed to do, but it's on you?
>
> A.     I believe we were doing what we were required to do per the terms of the construction loan agreement.

The Millers contend that substantial evidence was presented to the jury throughout trial that WesBanco did not administer the Millers' loan in conformity with their justified expectations.  For example, the Expectations form assured the Millers that WesBanco would attend to lien waivers, and Ms. Hamilton assured them that this extended to materialmen lien waivers, yet a mechanic's lien was asserted against the Millers after Residential Creations ceased work on their home.  The Millers also point out that WesBanco accepted Builder's Affidavits tendered by Residential Creations when the area for providing information about amounts paid to sub-contractors or materialmen and the amounts that remained due was not completed.  The Millers contend that WesBanco's

44

cavalier observance of its own documents supplied the jury with ample evidence to determine that WesBanco had breached the covenant of good faith and fair dealing in its contract with the Millers.

We find no reversible error. Although counsel's first attempts at posing his question about the duty of good faith and fair dealing were phrased in a way that indicated paragraph 7 could be interpreted under principles of good faith and fair dealing, those questions were not answered. In the end, counsel properly phrased the question in a manner that did not modify WesBanco's obligations pursuant to the parties' agreement. Rather, counsel effectively asked whether WesBanco's reliance on paragraph 7 would show bad faith "if WesBanco failed to do something that they should have done in regards to a mechanic's lien," and then relied on paragraph 7 to nevertheless hold the Millers responsible for WesBanco's failure. Furthermore, the jury was properly instructed as follows:

> The Court instructs the jury that West Virginia law implies a covenant of good faith and fair dealing in every contract for purposes of evaluating a party's performance of that contract. However, by the same token, the implied covenant of good faith and fair dealing cannot give contracting parties rights which are inconsistent with those set out in the contract.

> Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party; it excludes a variety of types of conduct characterized as involving bad faith because they violate standards of decency, fairness, or reasonableness.

In this case, counsel ultimately phrased the question to correctly state the doctrine of good faith and fair dealing, and it was the properly phrased question that was answered by the witness. Furthermore, the jury was properly instructed as to the law of good faith and fair dealing. Accordingly, we find that WesBanco did not suffer any prejudice resulting from the initial, improperly phrased queries that were not answered by the witness. Therefore, any error that may have occurred was harmless. *See Tennant v. Marion Health Care Found., Inc.*, 194 W. Va. 97, 111, 459 S.E.2d 374, 388 (1995) ("Under West Virginia law, when substantial rights are not affected, reversal is not appropriate. A party is entitled to a new trial only if there is a reasonable probability that the jury's verdict was affected or influenced by trial error."); *Danser v. Dorr*, 72 W. Va. 430, 432, 78 S.E. 367, 367 (1913) ("This court will not reverse for harmless error.").

**3. Judgment as a Matter of Law.** WesBanco next argues that the circuit court erred in denying its motion for judgment as a matter of law, made pursuant to Rule 50(b) of the West Virginia Rules of Civil Procedure. WesBanco explains that the Millers' alleged two breach-of-contract claims: one based on WesBanco's disbursement of loan funds for unfinished work ("unfinished-work claim"), and the other based on WesBanco's failure to obtain lien waivers from O.C. Cluss ("lien-waiver claim"), which would have alerted them to Residential Creation's failure to pay for materials. WesBanco argues that the Millers not only failed to establish liability as to their unfinished-work claim

46

and their lien-waiver claim, but they also failed to establish that they suffered any damage as a result.

With respect to the unfinished-work claim, WesBanco notes that the jury was instructed that,

> [i]n order to prevail on their first breach of contract claim, the Millers must prove each of the following by a preponderance of the evidence: one, that WesBanco was prohibited by the contract to pay Residential Creations for work that was not done; two, that WesBanco paid Residential Creations for work that was not done; and three, that they incurred damages because WesBanco paid Residential Creations for work that was not done.

WesBanco argues that the Millers failed to show that WesBanco paid Residential Creations for work that was not done. To support this argument, WesBanco notes that it disbursed funds according to benchmarks set out in the draw schedule that was part of the construction contract between the Millers and Residential Creations, and the Millers admitted that the draw schedule placed them underwater from the start. WesBanco argues further that the evidence established that it never released a draw payment without first obtaining four documents assuring that the corresponding benchmark had been finished: (1) a Builder's lien waiver; (2) a Builder's Affidavit; (3) an Inspection Report; and (4) the Millers' signed authorization.

With respect to the Millers' lien-waiver claim, WesBanco notes that the jury was instructed that,

47

> [i]n order to prevail on their second breach of contract claim, the Millers must prove each of the following by a preponderance of the evidence: one, that WesBanco was required by the contract to get a lien waiver from O.C. Cluss; two, that WesBanco did not get a lien waiver from O.C. Cluss; and three, that they incurred damages because WesBanco did not get a lien waiver from O.C. Cluss.

WesBanco argues that the Millers had to show that WesBanco was required by the contract to obtain a lien waiver from O.C. Cluss, a materialman. WesBanco argues that it was required to obtain lien waivers from materialmen in only three specific instances: (1) if materials had been supplied to the site before the initial advance, then WesBanco was required to obtain lien-waivers from any supplier of such materials before disbursement of the initial advance; (2) if materials had been supplied to the site before the initial advance, then WesBanco was required to obtain lien-waivers from any supplier of such materials before each subsequent disbursement; and (3) WesBanco was required to obtain lien wavers from materialmen before the final disbursement, which never occurred.[22] According to WesBanco, there was no dispute that O.C. Cluss did not supply materials before the initial advance, and the final disbursement never occurred; therefore, WesBanco claims that it had no contractual obligation to obtain any lien waivers from O.C. Cluss. WesBanco then reiterates its argument that the contract language was clear as to lien waivers and therefore should have been applied rather than construed. WesBanco next argues that, in paragraph 7 of the contract, the Millers agreed to hold WesBanco harmless

---

[22] The final disbursement was never made due to Residential Creations' failure to complete the project.

from any liability resulting from mechanic's liens.  The Millers do not respond to the foregoing arguments.

> This Court has held that,
>
>> "[i]n considering whether a motion for judgment notwithstanding the verdict under Rule 50(b) of the West Virginia Rules of Civil Procedure should be granted, the evidence should be considered in the light most favorable to the plaintiff, but, if it fails to establish a *prima facie* right to recover, the court should grant the motion."  Syllabus point 6, *Huffman v. Appalachian Power Company*, 187 W. Va. 1, 415 S.E.2d 145 (1991).

Syl., *First Nat'l Bank of Bluefield v. Clark*, 191 W. Va. 623, 447 S.E.2d 558.  *See also* Syl. pt. 1, *Jones v. Patterson Contracting, Inc.*, 206 W. Va. 399, 524 S.E.2d 915 (1999) ("'"When the plaintiff's evidence, considered in the light most favorable to him, fails to establish a prima facie right to recovery, the trial court should direct a verdict in favor of the defendant." Syl. Pt. 3, *Roberts v. Gale*, 149 W. Va. 166, 139 S.E.2d 272 (1964).'  Syl. Pt. 1, *Brannon v. Riffle*, 197 W. Va. 97, 475 S.E.2d 97 (1996).").  The term "prima facie" refers to evidence that, without contradiction, tends to prove a fact:

> "The words 'prima facie,' as used in connection with the force and effect of the evidence, mean no more than that the latter, on its face or at first view and without contradiction or explanation, tends to prove the fact in issue–not that it does necessarily establish it.  Perhaps a more exact legal definition is that it is such as is, in judgment of law, sufficient to establish the ultimate fact, and, if not explained or rebutted, remains sufficient for that purpose. . . ."

*State v. Tincher*, 81 W. Va. 441, 445, 94 S.E. 503, 505 (1917) (quoting *State v. Russell*, 80

S.E. 66, 68 (N.C. 1913)). *See also prima facie*, Black's Law Dictionary (7th ed. 1999)

("Sufficient to establish a fact or raise a presumption unless disproved or rebutted.").

Moreover, elaborating on what is meant by viewing the evidence favorably to the

nonmoving party for purposes of a motion for judgment as a matter of law, this Court has

explained that,

> ""[u]pon a motion to direct a verdict for the defendant,
> every reasonable and legitimate inference fairly arising from
> the testimony, when considered in its entirety, must be
> indulged in favorably to plaintiff; and the court must assume
> as true those facts which the jury may properly find under the
> evidence. Syllabus, *Nichols v. Raleigh-Wyoming Coal Co.*,
> 112 W. Va. 85[, 163 S.E. 767 (1932)].'" Point 1, Syllabus,
> *Jenkins v. Chatterton*, 143 W. Va. 250[, 100 S.E.2d 808]
> (1957)." Syl. Pt. 1, *Jividen v. Legg*, 161 W. Va. 769, 245
> S.E.2d 835 (1978).

Syl. pt. 4, *Jones*, 206 W. Va. 399, 524 S.E.2d 915. *See also* Syl. pt. 3, *id*. ("'Upon a motion

for a directed verdict, all reasonable doubts and inferences should be resolved in favor of

the party against whom the verdict is asked to be directed.' Syl. Pt. 5, *Wager v. Sine*, 157

W. Va. 391, 201 S.E.2d 260 (1973)."). Stated another way,

> [i]n determining whether there is sufficient evidence to
> support a jury verdict, the trial court should: (1) consider the
> evidence most favorable to the prevailing party; (2) assume
> that all conflicts in the evidence were resolved by the jury in
> favor of the prevailing party; (3) assume as proved all facts
> which the prevailing party's evidence tends to prove; and (4)
> give to the prevailing party the benefit of all favorable
> inferences which reasonably may be drawn from the facts
> proved.

Louis J. Palmer, Jr., Robin Jean Davis, *Litigation Handbook on West Virginia Rules of Civil Procedure* 1191 (5th ed. 2017).

Rather than considering the evidence in the light most favorable to the Millers, WesBanco's arguments are founded on its interpretation of the Construction Loan Agreement and its position that the Construction Loan Agreement was the sole document encompassing the parties' contract. Contrary to WesBanco's position, however, we have concluded that, under the single transaction rule, the agreement between WesBanco and the Millers was not limited to only the Construction Loan Agreement.

The Millers presented evidence that WesBanco had assured them that no funds would be disbursed for work not completed. Indeed, the Expectations form expressly states that "[f]unds will not be disbursed for work not completed," and "[f]unds will not be disbursed for materials on site not installed." Furthermore, the Construction Loan Agreement states, in relevant part at paragraph 4.C., that "Lender shall, upon application of the Borrower make periodic disbursements to the Borrower for payment *for work actually performed*, materials delivered, or materials for the delivery of which the [B]orrower has entered into an agreement . . . ." (Emphasis added). Additionally, Ms. Hamilton testified that she had told the Millers that no funds would be disbursed until work was completed. Nevertheless, in disbursing funds, WesBanco relied on the draw schedule in the construction contract, which used benchmarks rather than completed work to

51

establish when draws should be made. The evidence at trial showed that, by following this draw schedule founded on benchmarks, WesBanco paid for work that was not completed.

To the extent that WesBanco argues that it never released a draw payment without first obtaining four documents assuring that the corresponding benchmark had been finished, we find that, taken in the light most favorable to the Millers, at least two of these documents fail to support WesBanco's position. First, the evidence demonstrated that WesBanco accepted Builder's Affidavits from Residential Creations that were not properly completed in that they failed to provide information about subcontractors and materialmen. Furthermore, the Inspection Reports established that the level of completed work on the home did not correspond with the percentage of funds WesBanco paid out with each draw. The last Inspection Report stated that the house was only fifty-three percent complete, while WesBanco had released $442,000 in loan funds, or approximately eighty percent of the Millers' loan. This evidence establishes the Millers' prima facie right to recover. Furthermore, we find the fact that WesBanco paid out eighty percent of loan funds for a house that was only fifty-three percent complete satisfied the Millers' burden to show they suffered damages.[23] Accordingly, the circuit court did not err in denying WesBanco's motion for judgment as a matter of law as to the Millers' unfinished-work claim.

---

[23] We here conclude that there was sufficient evidence that the Millers suffered damages from WesBanco's breach of contract by paying for unfinished work. Whether the Millers sufficiently proved the amount of their damages is addressed below.

Similarly, the Millers presented sufficient evidence of their lien-waiver claim to overcome WesBanco's motion for judgment as a matter of law. The Expectations form contained at least two provisions relevant to this issue. First, the form required a properly completed Builder's Affidavit: "Builder's Affidavit: Properly completed with all work detailed *including materials and labor for all sub contractors. The total amount due must be clearly identified.* The form must be signed by the general contractor in the presence of a notary public." (Emphasis added). In addition, the Expectations form provided "Lien Waivers: Required. Properly executed and notarized Lien Waivers must be presented by each sub contractor in addition to the general contractor." The Millers presented evidence that WesBanco accepted Builder's Affidavits from Residential Creations that were not properly completed, that failed to detail the work completed, and failed to provide information pertaining to sub contractors. Moreover, the Builder's Affidavit was to include

> the names of all parties who have furnished *material* or labor, or both, to the undersigned [Builder] for said work and of all parties having contracts or subcontracts with the undersigned [Builder] for specific portions of said work or for *materials* entering into the construction thereof and the amount due or to become due to each, and that the items mentioned include *all* labor and *material* required to complete said work according to plans and specifications[.]

(Emphasis added). Residential Creations failed to provide any of the required information. Instead, Residential Creations merely described the benchmark that had been reached. Despite this improperly completed form that omitted critical financial information regarding the construction, WesBanco accepted the incomplete Builder's Affidavits submitted by Residential Creations and released the requested loan funds. The evidence

53

further showed that blank Builder's Affidavit forms had been provided to the Millers by WesBanco. The Millers, in turn, gave the blank forms to their builder, Residential Creations. Thereafter, Residential Creations presented the completed affidavits to WesBanco along with each of its draw requests. The Millers did not see the completed forms and had no way of knowing that Residential Creations had failed to provide crucial information.

Furthermore, paragraph 4.B.(i) of the Construction Loan Agreement also addressed lien waivers and granted WesBanco discretion to determine whether they were needed: "Lender shall be under no obligation to advance funds hereinunder until Lender has obtained . . . the executed Waiver of Liens from the general contractor and from the subcontractors, suppliers and materialmen *if deemed necessary*." (Emphasis added). The Millers contend, however, that, even applying the language of the Construction Loan Agreement, the jury could reasonably have determined that WesBanco abused its discretion and violated its duty of good faith and fair dealing by failing to obtain lien waivers from subcontractors and materialmen before advancing funds. We agree, particularly where, as here, the percentage of funds advanced substantially exceeded the percentage of work completed on the home.[24] Thus, the evidence was sufficient for the

---

[24] We likewise reject WesBanco's contention that it was entitled to judgment as a matter of law based upon paragraph 7 of the Construction Loan Agreement, under which the Millers agreed that "any mechanic's lien filed upon the property shall be Borrower's sole responsibility" and they would hold WesBanco "harmless against all losses, including but not limited to, liability, costs, or damages resulting from same." At

54

jury to conclude that WesBanco breached its agreement with the Millers by failing to properly obtain lien waivers, and evidence of the resulting mechanic's lien by O.C. Cluss established that the Millers suffered damages.[25] Therefore, the circuit court did not err in denying WesBanco's motion for judgment as a matter of law with respect to the Millers' lien-waiver claim.

**4.    Damages Verdicts.**   In its final assignment of error, WesBanco argues that the circuit court erred in denying its Rule 59(a) motion for a new trial on damages because the damages awarded by the jury are against the clear weight of the evidence and would result in a miscarriage of justice.  We agree.

The jury awarded damages to the Millers in the amount of $404,500 for breach of contract in general.  Although the jury was instructed that the Millers had two breach-of-contract claims, the unfinished-work claim and the lien-waiver claim, the

---

trial, the Millers contended that, because WesBanco's failure to fulfill its contractual obligation to obtain lien waivers resulted in the O.C. Cluss mechanic's lien, WesBanco would violate its duty of good faith and fair dealing by seeking to enforce paragraph 7. *See Mountaineer Fire & Rescue Equip., LLC v. City Nat'l Bank of W. Va.*, ___ W. Va. ___, ___ n.9, 854 S.E.2d 870, 891 n.9 (2020) ("Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.").  Accordingly, paragraph 7 of the Construction Loan Agreement did not entitle WesBanco to judgment as a matter of law.

[25] We here conclude that there was sufficient evidence that the Millers suffered damages from WesBanco's breach of the lien-waiver provisions of the contract. Whether the Millers sufficiently proved the amount of their damages is addressed below.

damages award was not allocated between them. The $404,500 award appears to be the sum of $287,500, which represented the total amount expended by the Millers to complete their home after Residential Creations ceased construction (i.e. the unfinished-work claim), and $117,000, which is roughly the amount of the O.C. Cluss mechanic's lien (i.e. the lien-waiver claim). Nevertheless, whether and how the damages are split between the Millers' two breach-of-contract claims is merely presumed.

WesBanco argues that the Millers' unfinished-work damages were based on the difference between what they had expected to pay for their home and what they actually paid. The Millers' evidence included an eleven-page spreadsheet listing the amounts they spent to complete their home after Residential Creations quit work, which purportedly totaled $287,500.[26] This amount does not account for $113,000 that was never disbursed by WesBanco from the Millers' loan funds.[27] WesBanco provides the following chart to demonstrate the difference between what the Millers expected to pay for their home and what they actually paid:

---

[26] Mrs. Miller apparently had receipts to support the spreadsheet, but the receipts are not part of the appendix record.

[27] Mrs. Miller testified that the amount that was never disbursed by WesBanco was not made part of her construction loan, and her loan payments did not reflect any indebtedness based thereon.

| Expected Cost: | | Actual Cost: | |
|---|---|---|---|
| WesBanco Loan | $555,000.00 | WesBanco Loan | $442,000.00 |
| Down Payment | $149,000.00 | Down Payment | $149,000.00 |
| Out-of-Pocket Expenses | $0.00 | Out-of-Pocket Expenses | $287,500.00 |
| | $704,000.00 | | $878,500.00 |

Based on this chart, WesBanco argues that the Millers' damages for their unfinished-work claim should not have exceeded $174,500, the difference between their expected cost and the actual cost of completing their home. Yet the jury appears to have granted the Millers' $287,500 in unfinished-work damages.

With respect to the Millers' lien-waiver claim, WesBanco notes that the O.C. Cluss mechanic's lien includes $14,000 in charges for materials that were delivered after WesBanco authorized the last draw. Because WesBanco was never asked to authorize a payment for these expenses, it had no corresponding duty to obtain a lien waiver in relation thereto. Nevertheless, the entire amount of the $117,000 mechanic's lien appears to have been included in the damages award.

The Millers respond to the two preceding arguments by asserting that proof of damages to a reasonable degree of certainty does not demand absolute certainty to the exactitude of a mathematical calculation. The Millers contend that the jury award of $404,500 was made up of two elements, $287,500 representing the cost of completing their home as represented by their spreadsheet, and $117,000 for the O.C. Cluss mechanic's lien. Furthermore, the Millers submit that their damage claim is founded on three pillars: (1)

the amount of the mechanic's lien; (2) their spreadsheet itemizing out-of-pocket expenses they incurred to complete their home; and (3) the final report of WesBanco's appraiser demonstrating that their home was only fifty-three percent complete when Residential Creations quit working, which left the home forty-seven percent incomplete. The Millers assert that forty-seven percent of the $690,000 that Residential Creations was to have been paid for their completed home equals $324,300, but they completed their home to a lesser quality than originally planned and spent only $287,500.

This Court has held that

> [i]n an action to recover damages for breach of contract, when the case has been fairly tried and no error of law appears, the verdict of a jury, based upon conflicting testimony and approved by the trial court, will not be disturbed unless the verdict is against the plain preponderance of the evidence.

Syl. pt. 3, *Franklin v. Pence*, 128 W. Va. 353, 36 S.E.2d 505 (1945). Nevertheless, in order to recover substantial damages for a breach-of-contract claim, there must be sufficient proof.

> To entitle plaintiff to recover substantial damages for breach of contract, where the loss is pecuniary and susceptible of proof with approximate accuracy, he[/she] must establish the quantum of damages with reasonable certainty. Where no sufficient data is afforded whereby a jury may definitely ascertain the compensation due for the breach, recovery therefor can be nominal only.

Syl. pt. 2, *Wilson v. Wiggin*, 77 W. Va. 1, 87 S.E. 92 (1915). Moreover,

> [i]t is a fundamental principle of the law of contracts that a plaintiff is only entitled to such damages as would put him in

the same position as if the contract had been performed. *Bryant v. Peckinpaugh*, 241 Va. 172, 400 S.E.2d 201 (1991); *Associated Stations, Inc. v. Cedars Realty and Development Corp.*, 454 F.2d 184 (4th Cir. 1972). In other words, a plaintiff is not entitled to damages beyond his actual loss attributable to defendant's breach. *Horn v. Bowen*, 136 W. Va. 465, 67 S.E.2d 737 (1951).

*Milner Hotels, Inc. v. Norfolk & W. Ry. Co.*, 822 F. Supp. 341, 344 (S.D.W. Va. 1993), *aff'd*, 19 F.3d 1429 (4th Cir. 1994) (table decision).

Based on our examination of the record in this case, we agree with WesBanco that the damages awarded by the jury are against the weight of the evidence. First, as explained above, whether the jury intended to award damages for both of the two methods by which WesBanco breached the Construction Loan Agreement, and, if so, how those damages were apportioned, is subject only to speculation. Moreover, the Millers' damages for WesBanco's breach by paying for unfinished work was presented in the form of an eleven-page spreadsheet listing their expenses for completing the home. However, given that all of the loan funds were not disbursed by WesBanco, this list necessarily includes items for which WesBanco never released payments. Such items are not properly included in the Millers' damages award, particularly where no offset was given for the funds that WesBanco never disbursed. Additionally, many of the items are listed in very general terms, and the Millers direct us to no place in the record where they demonstrated that these items were included in their construction contract and were paid for in advance by WesBanco. It also is not clear that all of the items on the Millers' chart were actually

59

included in the Millers' construction contract with Residential Creations.[28]  Similarly, the jury award appears to include portions of the O.C. Cluss mechanic's lien that related to materials delivered after the last disbursement of funds by WesBanco.  Because the delivery of these materials post-dated the last draw request made to WesBanco, WesBanco had no contractual duty to obtain any lien waiver for these materials.  Thus, to the extent these damages may have been included, the award is against the evidence.  For these reasons, we find the circuit court abused its discretion in denying WesBanco's motion for a new trial with respect to damages.  Accordingly, we reverse the damages award and remand this case for a new trial on damages.

## IV.

## CONCLUSION

For the reasons explained in the body of this opinion, we find no error in the circuit court's order denying prejudgment interest to the Millers and we affirm that ruling. We likewise find no error in the circuit court's admission of parol evidence related to the agreement between the Millers and WesBanco, the manner in which the court allowed the Millers to present the duty of good faith and fair dealing, or the denial of WesBanco's

---

[28] For example, one expenditure of $5,500 is simply identified as "work Residential Creations was supposed to do," with no description of what the work actually involved.  Furthermore, while the construction contract indicates the Millers' garage was to have an unfinished interior, another expenditure appears to include drywall for the garage.

motion for judgment as a matter of law. These rulings also are affirmed. However, we find the jury's damages award of $404,500 was against the clear weight of the evidence; therefore, we reverse this award and remand this case for a new trial on damages only.

No. 20-0041: Affirmed.

No. 20-0042: Affirmed in part, Reversed in part, and Remanded.